## NADDO *v.* BARDON *et al.*

*(Circuit Court of Appeals, Eighth Circuit. July 5, 1892.)*

No. 92.

1. LACHES—WHAT CONSTITUTES—EXCUSE.

Plaintiff sued to recover land formerly owned by him and claimed by defendants under an execution sale, recorded deeds executed by his attorney in fact, and tax titles. Plaintiff alleged that the judgment was void, and that the other transfers were avoided by fraud on the part of the attorney. The suit was brought 17 years after the execution sale and the deeds of the attorney, and 13 years after the tax titles were recorded. To excuse his delay he alleged that for 10 or 12 years he had lived in Canada, and that "until recently he had not learned of the extent to which the transfers" sought to be avoided had been made; that for about 10 years he had known that the attorney and others claimed that he had lost all rights in the land, but until recently he had been too poor to enforce his rights. *Held,* that he was guilty of laches, which the allegations of the bill were not sufficient to excuse. 47 Fed. Rep. 782, affirmed.

2. SAME—EXPRESS TRUST—REPUDIATION.

The fact that defendant was complainant's trustee under an express trust will not avoid the effect of laches where the bill itself alleges that more than 10 years before it was filed defendant claimed that complainant had lost all right to the subject of the trust, and refused to account to him. 47 Fed. Rep. 782, affirmed.

3. SAME—FRAUD—WHAT CONSTITUTES.

Where a person assumes the management of property under a power of attorney only three days before his principal's title thereto is divested by the expiration of the period of redemption from a sheriff's sale, his failure to discharge the judgment and redeem from prior tax sales is not, in the absence of a showing of means wherewith to accomplish these purposes, such a fraud as will avoid the effect of laches on the principal's suit to recover the property from the agent or his grantees claiming under such sheriff's sale and tax titles.

Appeal from the Circuit Court of the United States for the District of Minnesota. Affirmed.

Statement by BREWER, Circuit Justice:

This case comes on appeal from the circuit court of the district of Minnesota. In that court a demurrer to the bill was sustained, and a decree entered dismissing the bill.

The facts, as they appear from the bill, are, in a general way, as follows: Plaintiff and appellant on January 1, 1863, received from the United States a patent for the land in controversy, situated in St. Louis county, Minn., to wit: The S. W. ¼ of the N. E. ¼ of section 5, township 49, range 14. On June 26, 1863, plaintiff, intending to remove, and in fact removing, to the province of Quebec, Can., executed a conveyance to his nephew, Pierre Etu. Though in form a warranty deed, it was intended by the parties only as a power of attorney to enable said Etu to manage and control the property in the absence of plaintiff. On July 7, 1864, having returned to the county of St. Louis, and Pierre Etu having removed to Canada, the latter conveyed the land to plaintiff by a deed executed in Canada, in the French language, duly executed according to the laws of Canada, but not witnessed or acknowledged according to the laws of this state. In September, 1870, plaintiff removed to Marquette county, Mich., where he resided 12 years, and then removed to Canada, living there till the commencement of this suit. During all these years he never revisited the county of St. Louis. On the 24th of September, 1870, he executed a power of attorney to one Richard G. Coburn, giving him power to sell and convey the lands, with right of substitution. Thereafter, and in 1872, a suit was brought against plaintiff by J. D. Ensign in the district court of said county of St. Louis, and a writ of attachment issued. In such suit a judgment was rendered, and under the judgment a levy and sale was made of the tract in controversy to John C. Hunter, of Duluth, for the sum of $400. A certificate of sale was issued by the sheriff on the 10th day of March, 1873. The title conveyed by this sale passed to James Bardon by certain conveyances of date July 15, 1875, and June 1, 1876. On March 7, 1874, by proper written instrument, James Bardon was substituted by Richard G. Coburn as agent for the plaintiff under the authority given in the power of attorney, and on May 13, 1874, a quitclaim deed was executed by said Bardon under such power of attorney and substitution by which the land was conveyed to John Q. Hubbard, and on the next day said Hubbard, under previous arrangement, reconveyed the land to said James Bardon individually, the consideration expressed in each of these deeds being the sum of one dollar. All the instruments up to and including the deed to Hubbard were duly and promptly recorded in the office of the register of deeds of the county; but the deed of reconveyance was not placed on record for over a year, and not till June 4, 1875. On May 14, 1875, Bardon obtained a quitclaim deed to himself from Pierre Etu, on the representation that there was a defect in the latter's conveyance to plaintiff, and that such quitclaim deed would perfect the title of plaintiff. On June 4, 1875, Bardon bought the land at a tax sale for the back taxes of 1872, and took the deed to himself. In 1878 the land was sold at another tax sale for the taxes of 1874, and bid in in the name of Mary Bardon, the sister of said James Bardon, and by her conveyed to him. These deeds were also promptly recorded. On February 4, 1880, James Bardon conveyed the property to Henry W. Sage for a consideration stated in the deed of $2,250. Some other

transfers took place subsequently, by which all the titles transferred through these various transactions passed to Frederick W. Paine, who on June 19, 1886, platted the land as an addition to the city of Duluth, under the name and style of "West Park Division of Duluth," which plat was on August 30, 1886, duly recorded. Thereafter lots were sold in this addition by him to different persons. On May 11, 1891, this suit was commenced. Some 94 persons were made defendants,—James Bardon, the substituted attorney, and the others, lot and block holders in the West Park division. The bill sets out the various conveyances, over 120 in number, by which these parties claim to hold title. The circuit court sustained the demurrer, and dismissed the bill on the ground of laches.

*F. O. Clark*, *H. S. Lord*, and *Alfred Russell*, (*Clark & Pearl*, on the brief,) for appellant.

*R. R. Briggs*, *Walter Ayers*, and *Alfred Jaques*, (*Jaques & Hudson*, *Charles H. Clague*, *Thomas Fairfax*, *Byrona A. Porter*, *James H. Porter*, *Henry Kirchman*, and *Arnold Peffer*, on the brief,) for appellees.

Before BREWER, Circuit Justice, and CALDWELL and SANBORN, Circuit Judges.

BREWER, Circuit Justice, (*after stating the facts.*) No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts to improve and make valuable the property he holds. It is a doctrine received with favor, because its proper application works out justice and equity, and often bars the holder of a mere technical right, which he has abandoned for years, from enforcing it when its enforcement will work large injury to many.

The general facts we have stated instantly suggest that this is a proper case in which to apply and enforce that doctrine. Plaintiff, in 1870, left the property, and moved to a distant country. So far as appears from the bill, from the time of his removal to the bringing of this suit—over 20 years—he not only never saw the property, but also never did a single thing to protect his possession, or give notice of any rights in it. Seventeen years before the commencement of this suit the legal title passed from him, and so passed by recorded deed made by an agent under power of attorney, if not by the Ensign judgment and sale. Two tax titles, in 1875 and 1878, were added to those made by the sheriff's sale and the deed under the power of attorney, and 13 years elapsed after these titles were placed on record with no note of warning from him to any one that he still had or claimed any right to or interest in the property. The land is a tract of about 40 acres, so near to the city of Duluth as to become an addition to it. By the census of 1870, Duluth was a small place, having a population of 3,131; by that of 1890, a large and prosperous city of 33,115 inhabitants. This rapid increase in population, together with the development of railroad and other indus-

tries, of which the court may fairly take judicial notice, make it evident that this addition to the city must have wonderfully increased in value. The multitude of deeds which the plaintiff describes in his bill show that many persons have bought lots relying upon the recorded title, and his allegation is that many of these purchasers have made improvements on the lots so purchased by the erection of dwelling houses. In other words, he summons into court nearly 100 persons who have in good faith made homes on the lots in this addition, relying on the sufficiency of the titles they have purchased, and without a warning from him that he had any claims upon the property. Surely, unless there be some strong and clear excuse for his silence these many years, equity and good conscience forbid that he should now dispossess them of their homes, and take to himself the value which their labors, coupled with that of their fellow citizens, himself not among the number, have given to this property.

The excuses tendered are absence, ignorance, and poverty. We quote from the bill the allegations in respect thereto:

"And your orator alleges that for about ten or twelve years last past he has resided in Canada, but that the transfers of the property of your orator, as previously set forth, and as appear by the records of the register of deeds for the said county, have been made without the knowledge and consent of your orator. And your orator has not until quite recently learned of the extent to which such transfers have been made. And your orator further alleges that for about ten years he has known that the said James Bardon and others claimed that he had lost or forfeited his rights to the said land, and that the said Bardon refused to account to him for his transactions with regard to the same, but your orator has during all said time since learning of such wrongful and fraudulent dealings on the part of said James Bardon, been poor and unable to pay the expense of litigation necessary to enforce his rights in the courts, and has been unable to procure, until recently, the assistance necessary to enforce his rights."

It appears elsewhere, as heretofore stated, that he has never been back to St. Louis county since he removed therefrom in 1870; so that he has been absent from the county in which the land is situated for over 20 years, the last 10 years of which he has lived in a different country. But absence of itself is no excuse. Travel and communication are easy. If he could not or did not care to go to Duluth, he could easily have written and ascertained exactly what was being done with the property, and with equal ease have given notice of his claims. This is not a case where a party is ignorant of the property or his title, as if it had descended to him by inheritance through the death of an ancestor, of whose death he was unaware, for he had himself taken the title from the government, and had lived upon the property. There cannot be one law of laches for the resident and another for the nonresident. In the case of *Broderick's Will*, 21 Wall. 503, 519, the supreme court, in reference to a similar excuse, said:

"They do not pretend that the facts of the fraud are shrouded in concealment, but their plea is that they lived in a remote and secluded region, far from means of information, and never heard of Broderick's death, or of the sale of his property, or of any events connected with the settlement of his estate, until many years after these events had transpired. Parties cannot thus, by their seclusion from the means of information, claim exemption from the

laws that control human affairs, and set up a right to open up all the transactions of the past. The world must move on, and those who claim an interest in persons or things must be charged with knowledge of their *status* and condition, and of the vicissitudes to which they are subject."

See, also, *McQuiddy* v. *Ware*, 20 Wall. 14.

Neither is his poverty any excuse for his laches. It is to the glory of our profession in this country that it is ever ready to champion the cause of the poor; and no man who has a just claim, and makes an effort to assert it, will ever fail of securing the needed professional assistance. The courts are always open, and the lawyers are always willing and at hand; and if he fails to establish his rights it is because he does not make an effort to assert them. In *Hayward* v. *Bank*, 96 U. S. 611, 618, it was observed:

"No sufficient reason is given for the delay in suing. His poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights."

And in the recent case of *Washington* v. *Opie*, 146 U. S. ——, 12 Sup. Ct. Rep. 822, a similar excuse was presented, and adjudged insufficient. See, also, *De Estrada* v. *Water Co.*, 46 Fed. Rep. 280.

Nor is mere ignorance, unexplained, an excuse. Indeed, his ignorance, as disclosed by the bill, was not as to the fact, but only as to the extent of the adverse rights. Notice the way in which this matter of ignorance is stated: He alleges that the transfers, set out at length in the bill, were "made without the knowledge and consent of your orator; and your orator has not until quite recently learned of the extent to which such transfers have been made." All that can be justly inferred from this is that as each transfer was made it was made without his knowledge or consent. How soon thereafter he became aware thereof is not disclosed. That he only quite recently learned of the extent to which they had been made carries with it the implication that he long since knew of some transfers. In other words, he did not know of all until, on examination by himself or counsel, he found them on the record. And that this is the true construction is strengthened by the clause following, in which he alleges "that for about ten years he had known that the said James Bardon and others claimed that he had lost or forfeited his rights to said land, and that the said Bardon refused to account to him for his transactions with regard to the same." This is a clear declaration that for more than 10 years prior to the suit he knew that his title was disputed, knew that his agent repudiated all responsibility, and yet he took no steps to enforce or even make known his rights. Surely, unless we ignore all the decisions of the supreme court of the United States, as well as those of other courts in respect to the necessity of prompt action in order to call into exercise the powers of a court of equity, we must hold that this delay of 10 years after knowledge is such laches as will bar plaintiff of relief. The case of *McQuiddy* v. *Ware*, 20 Wall. 14, is closely in point in this respect. In that case the title of the plaintiff to certain property had been divested, or sought to be, by judicial proceedings during the late war, he being at that time in the Confederate

States; and yet no challenge was made by him of those proceedings until six years after its close; and in respect to that the court observed:

"Why this delay? The plaintiff says he was in ignorance of them until recently, and that, as soon as he ascertained them, he took steps to assert his rights. Such a general allegation will not suffice to provoke the interposition of a court of equity. It will not do to remain willfully ignorant of a thing readily ascertainable. There has been free and uninterrupted communication between Tennessee and Missouri since the war closed, and the courts everywhere accessible for the prosecution of any cause of action. Besides, in the very nature of things, the complainant must have known soon after it occurred that an improved farm, once occupied by him, was in the possession of adverse claimants. This was notice sufficient to put him on inquiry, and this inquiry would have resulted in ascertaining all the facts stated in the bill. There is no reason given for the delay, nor any facts and circumstances on which any satisfactory excuse can be predicated."

But it is earnestly said by counsel that, while laches is often invoked in cases of constructive fraud and resulting trusts, it is never accepted as a defense in a case of an express trust and actual fraud; and the leading cases of *Michoud* v. *Girod*, 4 How. 561, and *Prevost* v. *Gratz*, 6 Wheat. 481, are cited. It is doubtless true that, where an express trust is once shown to exist, it is presumed to continue; and therefore no lapse of time will defeat an action to enforce rights under it. But when that trust is repudiated, and knowledge of the repudiation is brought home to the *cestui que trust*, the case is brought within the ordinary rules of limitations and laches. *Speidel* v. *Henrici*, 120 U. S. 377, 7 Sup. Ct. Rep. 610. Here, as we have seen, the plaintiff alleges that he knew of the existence of adverse rights, that his own title was disputed, and that his agent repudiated all obligations more than 10 years before he commenced this suit. And the disavowal of the trust was not by indirection, or a mere inference from the conduct of the trustee, but direct and unequivocal. He admits that his agent and trustee claimed that he had lost all rights in the property, and refused to account to him, and that he had known this fact for years. Thus he shows a known and distinct repudiation, and one of long standing. In the recent case of *Hammond* v. *Hopkins*, 143 U. S. 224, 250, 12 Sup. Ct. Rep. 418, it appeared that the trustees purchased, as charged here, through an intermediary at their own sale, and that court, through the chief justice, said:

"Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights, and the like. *Marsh* v. *Whitmore*, 21 Wall. 178; *Landsdale* v. *Smith*, 106 U. S. 391, 1 Sup. Ct. Rep. 350; *Norris* v. *Haggin*, 136 U. S. 386, 10 Sup. Ct. Rep. 942; *Mackall* v. *Casilear*, 137 U. S. 556, 11 Sup. Ct. Rep. 178; *Hanner* v. *Moulton*, 138 U. S. 486, 11 Sup. Ct. Rep. 408. Undoubtedly the doctrine is established that a trustee cannot purchase or deal in the trust property for his own benefit or on his own behalf, directly or indirectly. But such a purchase is not absolutely void. It is only voidable; and, as it may be confirmed

by the parties interested directly, so it may be by long acquiescence or the absence of an election to avoid the conveyance within a reasonable time after the facts come to the knowledge of the *cestui que trust*."

—And quoted the language of Mr. Justice GRIER in *Badger* v. *Badger*, 2 Wall. 87, 95, that a party seeking to avoid laches "should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how and when he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor may justly refuse to consider his case on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer." See, also, the cases of *Felix* v. *Patrick*, 145 U. S. 317, 12 Sup. Ct. Rep. 862, and *Galliher* v. *Cadwell*, 145 U. S. 368, 12 Sup. Ct. Rep. 873.

But is this a case of actual fraud? Bardon, the alleged wrongdoer, was not substituted as agent until March 7, 1874; and the deed which he executed was on May 13, 1874. But the property was sold on the 10th of March, 1873, on an execution sale, and the time for redemption expired on the 10th of March, 1874; so Bardon's responsibility as agent or trustee never arose until within three days of the time for the deed under the sheriff's sale. It was no fault of his that the land was sold under that sheriff's sale, nor that the land had been theretofore sold for taxes; and no misconduct or fraud is charged against Coburn, the original agent and attorney; nor does it appear that from the time he was substituted as agent or attorney he had received or could have realized a single dollar for the payment of this judgment or the discharge of the taxes. Where, then, was the actual fraud? It is true the bill alleges "that from the time of the making of the said power of attorney to the said Coburn by your orator up to the present time the said property has been of large value, and the proceeds from the use of the same from the very first were ample, and more than ample, to pay all taxes and expenses that could legally be brought against the said land;" and also that "the said land was worth from eight to ten thousand dollars, at least, when the said Bardon conveyed the same to the said Hubbard for one dollar, and took a deed back to himself for the amount as aforesaid." And it also appears from the power of attorney given to Coburn that there was a clearing of four acres on which plaintiff had erected a shanty. But surely, if Coburn, during the years of his agency, was unable to realize from the property money enough to pay the taxes and discharge this judgment, it could hardly be expected that Bardon in three days could accomplish that result. It is also true that the plaintiff alleges that the judgment was rendered without personal service, and that it was informal, irregular, and void. But it appears that he had property within the jurisdiction of this court, to wit, the land in controversy; that it was subject to attachment, and that the statutes of Minnesota authorized suits by attachment against nonresidents. The proceedings were had in a court of general jurisdiction, in favor of whose validity are all presumptions; and no defect in the proceedings is pointed out, nothing

to justify the general allegation that the judgment was informal, irregular, and void. Can it be that under such a general allegation the court is to treat that judgment as void? Counsel urge that it is sufficient to put the defendants upon answer; and that, when the facts are all presented, they will show how and why the judgment is void. But it is a familiar rule that a party who seeks to explain laches must make a full, clear, and specific statement of all the facts upon which he relies. No generality of statement will suffice. And when the title which is challenged rests partly upon a sale under a judgment of a court of general jurisdiction, an averment that the judgment was informal, irregular, and void, without the specification of any fact showing its invalidity, will be considered as a mere allegation of a conclusion of law, and not as a statement of fact. So that, upon the facts as presented in the bill, this alleged wrongdoer, Bardon, the substituted agent, assumed responsibility to the plaintiff only three days before the plaintiff's title was cut off; and there is no such showing of means, coupled with duty, as makes his failure to protect the plaintiff's title an enormous wrong and fraud. While we do not mean to say that there was no breach of duty, yet the reasonable and natural inference from the facts as stated is that Bardon, having no obligations to the plaintiff, saw that by the attachment proceedings and execution sale the title was passing away, and intending or having arranged to purchase the sheriff's title, sought to make it clearer and stronger by adding a conveyance under the power of attorney. In other words, it was not the effort of an agent to rob his principal, but the effort of a stranger to get an agent's deed to strengthen another title. In that aspect of the case, Bardon's conduct, though, if challenged promptly, subject to condemnation, was not such gross and outrageous fraud as will long years thereafter outweigh the laches of plaintiff. Indeed, as there is no specific allegation that plaintiff was ignorant of the proceedings in the *Ensign Case*, his long-continued inaction after knowledge of the various transfers is suggestive of the fact that he recognized that his title was destroyed by that sale, and that he therefore ceased to take any interest in or pay any attention to the property.

In any view that we have been able to take of this case, it seems to us that, if any rights remained to the plaintiff after that sale, his long delay in asserting them has not been excused; and that the decree of the circuit court in dismissing the bill on the ground of laches was correct, and it must be affirmed.