## KINNE et al. v. WEBB et al.

(Circuit Court of Appeals, Eighth Circuit. February 6, 1893.)

### No. 179.

1. EQUITY—RESCISSION OF CONTRACTS—UNREASONABLE DELAY.
    Where a party is entitled to rescind a contract on the ground of fraud, he must act promptly, with no vacillation, no unreasonable delay, no attempt to speculate upon his option. He must elect to rescind, and proceed as far as lies in his power to place himself and his purchaser in statu quo. This is especially true as applied to speculative property which is liable to great fluctuation in value. 49 Fed. Rep. 512, affirmed.

2. SAME.
    Where the owner of mining property, thinking the same has become exhausted, sells it to one who practices no fraud to obtain it, she cannot maintain a bill to rescind the sale after the lapse of seven years, and after the discovery of additional ores, which enhance the value of the land many fold.

3. LACHES—STATE STATUTES OF LIMITATION.
    A federal court should not, at the instance of a widow, set aside a transfer of personal property by her husband to his children by a former marriage, made shortly before his death, when, with full knowledge of the facts, she has remained silent for more than five years, which is sufficient under the Missouri statute to bar an action to recover personal property.

4. HUSBAND AND WIFE—ANTENUPTIAL CONVEYANCE.
    A man about to marry may convey a reasonable portion of his property to his children by a former wife, and such conveyance is not a fraud upon the second wife.

Appeal from the Circuit Court of the United States for the Western District of Missouri. Affirmed.

O. H. Dean, (I. J. Ketcham and C. O. Tichenor, on the brief,) for appellants.

L. C. Krauthoff, (E. O. Brown, J. V. C. Karnes, and Daniel B. Holmes, on the brief,) for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and SHIRAS, District Judge.

SANBORN, Circuit Judge. This is a bill in equity to rescind a sale and avoid a deed made by the appellant Sarah M. Webb, now Sarah M. Kinne, April 24, 1883, of all her interest in the estate of her deceased husband, John C. Webb, to his children and devisees, Elijah T. Webb, Martha E. Hall, and Mary S. Burgner. The circuit court dismissed the bill. 49 Fed. Rep. 512.

In March, 1877, John C. Webb resided in Webb City, Jasper county, Mo., and was the owner of about 1,000 acres of land in that county, 160 acres of which was valuable mineral land, from which lessees of his were mining zinc and lead. He was a widower, and had the three children above named. He had conveyed to the defendant Martha E. Hall 20 acres of mineral land, and on the 3d day of March, 1877, he conveyed to the defendants Webb and Mary Burgner 40 acres of land of that character, in order that his gifts to each of his three children might be equal; but this deed was not

recorded, nor did the grantees take possession under it until April 24, 1883. On March 4, 1877, he intermarried with the complainant Sarah M., and died April 13, 1883. He left a will, by which he bequeathed to his widow his household furniture and the homestead and $600 a year so long as she remained his widow. She had the right, under the statutes of Missouri, to refuse to accept the provisions of the will, and to receive in lieu thereof one fourth of the personal estate and her dower right in the lands. Rev. St. Mo. § 4517. He owned a bank at Webb City, whose capital was $6,500. He bequeathed the lot on which the bank building stood, the building, its furniture, the profits derived from the bank capital, and $15,000 to the defendant Webb. He made other specific bequests, and then devised the remainder of his estate to his three children. This will was made in August, 1882, and named the defendant Webb as executor. On April 7, 1883, he conveyed the bank capital and $16,100 which he had on deposit in the bank to the defendant Webb, and he received this transfer in satisfaction of the bequest contained in the will of $15,000 and the profits of the bank capital. The estate consisted of personal property of the value of about $16,000, about 900 acres of land, of no great value, (unless ore should be subsequently discovered on it,) 120 acres of mineral land, from which the deceased had been receiving a royalty of from $1,000 to $2,000 per month, and town lots in Webb City. Webb City had from 1,000 to 2,000 inhabitants, and was dependent entirely upon the mining operations for its existence. The great value of the estate (if it had such value) was in the 120 acres of mineral land and the town lots, and that value was entirely dependent upon the successful continuance of the mining. In 1878 and 1879 mining upon these lands had been successful and lucrative, but the ore had been taken from near the surface of the ground. In 1883 and 1884 these runs of ore near the surface seemed to be nearly exhausted. The machinery upon the Webb land was insufficient to sink deep shafts and pump the water from them, so that the miners could work, and the lower runs of ore which subsequently made the land valuable had not been discovered. No one, apparently, knew they were there. Between 1879 and 1883 many miners in and about Webb City had become discouraged, and moved away from the town. Its population had diminished, some of the houses had been moved away to adjoining cities, until in 1883 lots were not salable at any price, their value was merely nominal. The stock of the mining company which was paying the royalty to the Webb estate had become of nominal value, the company itself was insolvent, and the manager was trying to sell his machinery, and abandon his operations. The complainant Sarah M. Webb was an intelligent, capable, well-informed lady, who had been familiar with her husband's property, and had at times had charge of his promissory notes and papers. She understood the precarious and speculative nature of the property of the estate; that, if the lessees ceased mining, it would become of little value, and Webb City would be an abandoned town, but that, if sufficient ore could be developed and profitably mined, the property would be of very great value.

Immediately after the death of her husband she offered her interest in the estate for sale. She offered it at different times to two of her neighbors for $8,000 and $10,000 respectively. They refused to buy, but suggested that the defendant Webb might do so. She persuaded them to go to him and get him to buy. They did so, and the result was that she offered to sell her interest to him for $15,000, the household furniture, a cow, and horse and buggy, and he offered her $8,000. She said she would consult an attorney before she would take that, and broke off the conference. She did consult the attorney of her deceased husband. He advised her that she was entitled to one fourth of the personal estate and her dower in the realty, and that she ought to get from $30,000 to $50,000 for her interest. She inquired of this attorney and of the lessee and learned from them the amount of royalties received monthly from the mines. She knew before she made her deed of the conveyance of the 40 acres to the defendants Webb and Mary Burgner in 1877, and of the transfer of the bank capital and deposits in April, 1883, and with all this knowledge; after consulting with at least three business men, whom she selected as friends of hers, and with her deceased husband's attorney, she sold and conveyed her interest to the three children for the exact price she first asked them for it, which amounted in the aggregate to about $17,000.

The bill alleges that this estate was worth $300,000; that defendant Webb was his father's confidant, and had full knowledge of this fact; that he importuned and persuaded the widow to sell her interest; that he falsely represented to her that the estate was not worth more than $60,000; that the complainant was much fatigued; that she had no legal or independent advice, and no knowledge of the value of the estate except that given to her by the defendant Webb, and that she was induced to convey by his misrepresentations. The complainant Sarah does testify that the defendant Webb told her that the estate had been appraised, and would not reach over $60,000 or $80,000, and was much involved; but he denies this, and says he told her that it might be worth $75,000 or $100,000 or more. Every other allegation of this bill tending to prove fraud or undue influence by him is not only not established, but it is disproved by a large preponderance of the testimony. The weight of the testimony is that the estate was worth from $45,000 to $75,000, but that it was of such a speculative character that it was difficult to appraise it.

The original bill was filed February 7, 1890. On October 4, 1890, complainant filed an amended bill in which, in addition to the averments of the original bill, she pleaded the deed of March 3, 1877, to the defendants Webb and Mary Burgner, and the transfer to the defendant Webb of the bank capital and deposits April 7, 1883, alleged that she first learned of these in August, 1890, and prayed that they might be declared void, and that her share of the moneys and the 40 acres might be accounted for by the grantees. The record, however, conclusively proves that all the facts relative to this deed and transfer were disclosed to her in a deposition of the defendant Webb, taken at her instance in a former suit between them, in July, 1884, and that she knew of the deed soon after her marriage

in 1877, and of the transfer of the bank capital and deposits early in 1883. She received the proceeds of her sale, and invested it in real estate in Carthage, Mo., Kansas City, Kan., and in other ways, and never returned or offered to return any of it to the purchasers. On July 28, 1883, she filed in the probate court her refusal to accept the provisions of the will. On the same day she brought a suit to set aside her deed on the ground that it was procured by fraud and misrepresentation. She caused her own deposition to be taken in this suit, and March 31, 1884, she dismissed it. April 18, 1884, she commenced another suit for the same cause. July 28, 1884, she caused the deposition of the defendant Webb to be taken in that suit, and she dismissed it December 2, 1884. During the years 1883 and 1884 the depreciation in the value of property about Webb City continued, and in 1885 the defendants reduced the royalty charged their lessees about 25 per cent. The lessees then expended about $100,000 in new and improved machinery, sunk deeper shafts, and found the lower runs of ore in quantities seemingly inexhaustible. Between 1884 and 1890 the defendants themselves expended in improvements on these lands more than $50,000. Prosperity returned to Webb City; the miners came back; they filled the vacant houses and built new ones; the royalties derived from the lands amounted at times in 1889 and 1890 to $4,000 a month, and averaged nearly $3,000 monthly. The lands of the estate increased in value proportionately, and then the complainant filed this bill.

1. Conceding for the present that the deed of April 24, 1883, was obtained from the complainant Sarah by the fraud and misrepresentation of the defendant Webb, she cannot maintain this bill. She discovered every material fact she now knows relative to the matters here in dispute as early as July 28, 1884, when she took the defendant Webb's deposition, and she then had the option to rescind the sale, return the purchase price, and recover back her share of the estate, or to abandon her suit, and ratify her sale. She waited until December 2, 1884, and then elected to dismiss her suit, and presumptively to abandon her right to rescind and to ratify the sale and deed. She never tendered or offered to return any of the consideration she received for the deed. She did not do so in this bill, and much is said in appellants' brief in support of the position that she was not required to make such an offer in her bill. It is unnecessary to consider this question of pleading, because there is a more substantial and fatal obstacle to enforcing the rescission she seeks in the acts of the complainant herself before she instituted this suit. If one would invoke the aid of a court of equity to enforce such a rescission, he must act promptly, with no vacillation, no unreasonable delay, no attempt to speculate upon his option. He must elect to rescind, and steadily and consistently proceed as far as lies in his power to place himself and his purchaser in statu quo. A mere notice of his election is not enough. He cannot give notice of his election to rescind, and still retain his purchase price until the statute of limitations has almost run against his suit, and then bring it if the property has advanced in value, and abandon it if it has depreciated. He may not speculate upon his option. The vendee has the right to know whether

the claim for rescission is to be pressed or abandoned, and that speedily. If it is not pressed, if the suit to enforce it is dismissed, and no suit is instituted for five years, as in this case, he has a right to presume that the right of rescission is abandoned, that the vendor has elected to confirm the sale, and he may make improvements upon and deal with the property on the faith of that presumption. The vendor whose delay, vacillation, and attempted speculation has established the presumption, will not be heard in equity to deny it. Rugan v. Sabin, 53 Fed. Rep. 415; (decided by this court at the December term;) McLean v. Clapp, 141 U. S. 429, 12 Sup. Ct. Rep. 29; Grymes .v. Sanders, 93 U. S. 55, 62; Oil Co. v. Marbury, 91 U. S. 587; Hayward v. Bank, 96 U. S. 611, 618; Follansbe v. Kilbreth, 17 Ill. 522, 526, 527; Jones v. Smith, 33 Miss. 215, 268; Estes v. Reynolds, 75 Mo. 563, 565; Johnston v. Mining Co., 39 Fed. Rep. 304. In Grymes v. Sanders, 93 U. S. 55, 62, Mr. Justice Swayne said:

"Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value. Thomas v. Bartow, 48 N. Y. 200; Flint v. Woodin, 9 Hare, 622; Jennings v. Broughton, 5 De Gex, M. & G. 139; Lloyd v. Brewster, 4 Paige, 537; Railroad Co. v. Row, 24 Wend. 74; Minturn v. Main, 7 N. Y. 220; 7 Rob. Pr. c. 25, § 2, p. 432; Campbell v. Fleming, 1 Adol. & E. 41; Sudg. Vend. (14th Ed.) 335; Diman v. Railroad Co., 5 R. I. 130."

No property is more speculative in its nature, none is more liable to large and constant fluctuations in value, than mining property like that here in question. The quarter section which the lessee was about abandoning as exhausted in 1883, and which one of the witnesses says would not, if abandoned, have been worth six bits an acre, has, by the discovery of deeper runs of ore, and the expenditure of larger sums of money in working it, become worth a quarter of a million of dollars. Lots in Webb City that could not be sold in 1883 for $500 became worth in 1890 more than $500 a front foot. One of the witnesses testified that in 1883, when the complainant Sarah sold her interest, "she said she believed the mines were about played out; and she was not alone in that opinion at that time." She brought her suit for rescission in July, 1883, to dismiss it in March, 1884. She brought another in April of that year, but gloom and depression still enveloped Webb City and all its surroundings, and she dismissed that suit in December following. In 1890 she filed this bill. The explanation of all this is plain. In April, 1883, she preferred $17,000 in hand to the uncertain value of her interest in this precarious and speculative property. In July, 1883, she changed her mind, and preferred her chances in the speculation, provided, always, she could still retain the certain benefits of her sale, for she never returned the $17,000. In December, 1884, she still preferred the $17,000, and hence dismissed her bill. In 1890, when the speculative property was worth

fivefold its value in 1883, when $150,000 had been expended upon it by her purchasers and their lessees, she again and wisely changed her mind, and preferred the speculation. By this course of action for six years and a half she escaped every chance of loss, every possibility of that exhaustion of the mines and depreciation of the property that the testimony proves were probable when she sold, and made safe and sure for herself the $17,000 for which she sold. She now seeks the advantage of the risks her purchasers took. Equity does not permit one for such an unreasonable length of time after the discovery of the fraud that induces a contract to retain its benefits and repudiate its burdens. Such delay and vacillation, such an evident attempt to speculate in the right to rescind, is fatal to any attempt to enforce it in a court of equity. Such a course of action is very far from that good faith and reasonable diligence that will induce favorable action from such a court.

2. But the proof fails to establish the charges of fraud and misrepresentation in the bill. The defendant Webb had not qualified as executor when this deed was made. He was not the attorney or confidential friend of the widow. He was not her agent to sell her interest in this property. On the other hand, it is clearly proved that she had no confidence in him; that she would not believe what he said, and that she looked upon every act and deed of his with suspicion. She was an active, alert, intelligent woman, in full possession of all her faculties. She had had possession of many of the papers of her late husband, and was apparently as familiar as any one with his property and its value. She consulted with three business men, whom she selected as her friends, and with her husband's lawyer, and then, with full knowledge of the facts, of the property and the royalties received from the mines, obtained by independent inquiry of the lessee and the lawyer, she fixed her own price for her interest, and, after importuning her neighbors to buy it for much less, sold it through the defendant Webb to him and his sisters. She dealt with the defendant Webb at arm's length, she dealt with him at her own solicitation and on her own terms. That, in view of the subsequent discovery of the deeper runs of ore, and the consequent rapid advance in the value of the property, she made a bad bargain, is no ground for recovery here, and yet that is all the proofs establish. They establish no importuning, no undue influence, no fraud, no misrepresentation, no concealment inducing this conveyance, and the complainants were not entitled to any relief on the merits. Colton v. Stanford, 82 Cal. 351, 373, 23 Pac. Rep. 16; Cobb v. Wright, 43 Minn. 83, 85, 44 N. W. Rep. 662; Chambers v. Howell, 11 Beav. 13, 14.

3. The complainants are not entitled to a decree setting aside the deed of March 3, 1877, to the defendants Webb and Mary Burguer, because there was no evidence that this deed was made with any intent to defraud the complainant Sarah. The 40 acres conveyed did not exceed a reasonable gift by the father to these two children in view of the amount and value of the property he owned. The testimony is that it was made to put these two children on an equality with the other daughter, to whom the father had already con-

veyed 20 acres.    It was a reasonable gift to the children of a former marriage.   It was not fraudulent in itself, and the evidence negatives any intention on the part of the grantor to defraud the complainant, whom he was about to marry, and the deed ought not now to be set aside.    1 Scrib. Dower, 589, 590; Tucker v. Tucker, 32 Mo. 464, 468; McReynold's Ex'r v. Gentry, 14 Mo. 495, 497, 498; Crecelius v. Horst, 89 Mo. 356, 359, 14 S. W. Rep. 510.

4. The complainants were not entitled to a decree setting aside the transfer of the bank capital and deposits, made April 7, 1883, and granting them a share in these or any of the personal estate left by the deceased.    There is plenary proof that the complainant Sarah knew of the material facts relating to these matters in 1883, and that they were disclosed to her under oath by the defendant Webb, July 28, 1884.    In the courts of Missouri all right of action to recover any of this personal property was barred five years from her discovery of these facts.    2. Rev. St. Mo. § 6775; Hunter v. Hunter, 50 Mo. 445, 451; Bobb v. Woodward, Id. 95, 103.    A federal court, sitting in equity, which acts or refuses to act in anology to the statute of limitations, ought not to be moved to set aside such a transfer, or to enforce such a constructive trust, where the complainant has, without excuse, remained silent and supine for a longer time after the discovery of the material facts constituting her cause of action than the time limited by the statutes of the state in which the action is brought for the commencement of actions for such relief.    Indeed, in view of the great delay of the complainants, the absence of any excuse for this delay, the rapid and striking change in the character and value of the property in question since 1884, and the improvements and expenditures that have been made upon it since that date, it would be extremely difficult for the complainant to overcome the defense her laches has interposed to this suit, if no other defense existed.    Naddo v. Bardon, 51 Fed. Rep. 493; Lemoine v. Dunklin County, Id. 487; Rugan v. Sabin, supra.    There is no view of this case in which the complainants were entitled to any relief, and the decree below is affirmed, with costs.