KIMBELL et al. v. CHICAGO HYDRAULIC PRESS BRICK CO. et al.

(Circuit Court of Appeals, Eighth Circuit.　November 12, 1902.)

No. 1,735.

1. CORPORATIONS—SUIT BY STOCKHOLDER FOR CANCELLATION OF STOCK—SUFFI-CIENCY. OF BILL.

A bill by a stockholder, praying for the cancellation of stock issued by a corporation 10 years previously in payment for the exclusive right to operate under certain patents for the manufacture of bricks within a prescribed territory, which right, it is alleged, was of no value, does not state a cause of action for relief on that ground, although the stock was issued under a statute providing that such corporations should issue stock only "for money paid, labor done or money or property actually received"; there being no allegation in the bill that the exclusive rights, on account of which the stock was issued, were known or believed to be valueless at the time of the transaction, and there being no allegation in the bill that the exclusive rights in question were not properly assigned to the corporation, and no allegation that the corporation had not exer-cised the exclusive rights or operated under the patents so acquired. Held, further, that, in the absence of such allegations as those last men-tioned, it might well be inferred that the stock was issued in exchange for rights that were supposed at the time to be of great value, and that the rights so acquired had been thereafter continuously exercised.

2. SAME—LACHES.

A stockholder is barred by laches from maintaining a suit in equity for the cancellation of stock issued by the corporation, and to charge the holder as trustee with the amount of dividends received, on the ground that the issuance of the stock was ultra vires, under the state statute, where it was issued 10 years before the bill was filed, during all of which time complainant was a stockholder, and where there was no conceal-ment of the transaction, which was fully shown by a resolution of the directors appearing of record in the proper minute book of the corporation.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

This case passed off below on a demurrer to a second amended bill of com-plaint, which demurrer was sustained; whereupon the complainants submitted to a decree dismissing the bill, and appealed.

The bill is very lengthy, but the material facts averred are as follows: Charles B. Kimbell and Libbie A. Kimbell, the complainants below and the appellants in this court, are stockholders in the Chicago Hydraulic Press Brick Company, a Missouri corporation, which is hereafter referred to as the Chicago Company.　Charles B. Kimbell owns 100 shares of stock, of the par value of $100 each, represented by a stock certificate dated July 10, 1890.　Libbie A. Kimbell, as the devisee of her husband, J. W. Kimbell, is the owner of 50 shares of stock, represented by several certificates, which were issued on July 9, 1891, and previously.　All of said stock was issued on the full payment of subscriptions therefor which were made by Charles B. Kimbell and J. W. Kimbell prior to March 17, 1890.　J. W. Kimbell died July 16, 1897.　Edward C. Sterling is the president and Henry W. Eliot is the secretary and treasurer of the Chicago Company, and they have re-spectively filled those offices since the corporation was organized, on February 18, 1890.　The same individuals also hold the same offices, respectively, in another Missouri corporation, the Hydraulic Press Brick Company (one of the appellees), which is hereafter referred to as the St. Louis Company, and they have held the offices in question in the latter company since February 18, 1890.　The capital stock of the Chicago Company was fixed in its articles of association at $600,000, one-half of which, as its articles of association, when filed, declared, had been paid for in cash; but the complainants are

informed that the statement to that effect was untrue, and that the payment was in fact made with valueless and useless patents. On July 18, 1890, the Chicago Company issued to Edward O. Sterling, as trustee for the St. Louis Company, a certificate for 3,200 shares of its capital stock. This certificate was subsequently, on February 5, 1901, reissued to Henry W. Eliot, as trustee, for 3,047 shares, a certain portion of the stock originally held in trust having at that time been sold. This stock was issued to Sterling as trustee, and subsequently to Eliot as trustee, for a pretended license to use certain patented machines, namely, two hydraulic press brick machines, fourteen kilns, and one pulverizer, which the Chicago Company bought of the St. Louis Company, paying therefor, as it is said, their full value. On March 17, 1890, a resolution was passed by the directors of the Chicago Company, approving of a purchase from the St. Louis Company of the exclusive right to use certain patents controlled by the latter company, within a circle having a radius of 100 miles, whose center was the Board of Trade Building in the city of Chicago, Ill., for the price and sum of $300,000. This resolution, the complainants say, was illegally adopted because only five of the seven directors of the Chicago Company were present at the meeting, among whom were Sterling and Eliot, who are said to have been disqualified from voting because they were heavily interested in the St. Louis Company, and because a by-law of the Chicago Company declared that at special meetings no action taken should be deemed binding unless adopted by a majority of the full board of directors. The complainants have no knowledge of the assignment of any patents by the St. Louis Company to the Chicago Company except as shown by the aforesaid resolution of March 17, 1890. They believe that the St. Louis Company did not own any patents covering brick machines and mechanical devices and processes for the making of brick. They say, however, that it did obtain a license under or an assignment of certain patents for brick-making machines from one Graves, on May 19, 1890, but complainants are not aware of the terms of that license or assignment. The resolution to pay the St. Louis Company $300,000 for the use of its patents as aforesaid was the only consideration for the issuance of the aforesaid shares of stock to Sterling, and for the subsequent issue of stock to Eliot, as trustee for the same company. By the aforesaid arrangement to pay $300,000 for the use of patents, the Chicago Company's stockholders were defrauded to the extent of $320,000, the par value of the stock so issued. The restriction placed upon the use of the brick machines which were purchased as aforesaid from the St. Louis Company, confining their use within a circle having a diameter of 200 miles, was in violation of public policy and the patent laws of the United States. The St. Louis Company actively promoted the organization of the Chicago Company. No prospectus was issued at the time of the organization of the Chicago Company showing what was intended, and the complainants did not ascertain what had been done until March 14, 1901, when they investigated the books of the Chicago Company and found out. The complainants are advised that the St. Louis Company had no right to hold stock in the Chicago Company nor the latter company the right to issue stock except for its par value in money or property actually received. The Chicago Company has paid dividends on the stock held by the St. Louis Company to the amount of about $151,000. The stock in question was issued to the St. Louis Company for promoting the Chicago Company, the license granted to use its patents being of no real value. The complainants say that they had no notice of the illegal issuance of said stock or a suggestion putting them on inquiry. Moreover, that the transaction was not called to their attention and does not appear on the books of the Chicago Company except as it is disclosed by the aforesaid resolution of March 17, 1890, to purchase the right to use certain patents, for the sum of $300,000. One of the complainants, Charles B. Kimbell, has been an invalid since 1888. The complainants sue in behalf of all stockholders, and pray that the 3,047 shares of stock be canceled; that a judgment be entered in favor of the Chicago Company and against the St. Louis Company for all dividends paid to the St. Louis Company on the stock in question; that Sterling and Eliot be enjoined from voting the stock at any stockholders' meeting of the Chicago Company; and that, if anything was given for the stock when it was issued, whatever was given

be restored to the person or persons to whom it of right belongs, on the cancellation of the stock.

Edmund H. Smalley and Edward A. Rozier, for appellants.

Edward Cunningham, Jr., for appellees Hydraulic Press Brick Co., Edward C. Sterling, and Henry W. Eliot.

W. Christy Bryan, for Chicago Hydraulic Press Brick Co.

Before SANBORN and THAYER, Circuit Judges, and LOCHREN, District Judge.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

In view of the allegations of the bill, the substance of which have been stated above, it is apparent that as early as March 17, 1890, the corporation in which the complainants are stockholders, namely, the Chicago Hydraulic Press Brick Company, agreed to issue to the Hydraulic Press Brick Company $300,000 worth of its capital stock in exchange for the exclusive right to operate under patents which the latter company controlled, such operations to be confined to a circle of territory 200 miles in diameter, which included the city of Chicago, and that in pursuance of that agreement stock to the amount of $300,000 was issued to the St. Louis Company, and has been outstanding ever since, and treated as in every respect valid. The bill does not aver that the St. Louis Company never owned or controlled any patents on machines or processes for making brick, as the complainants might easily have done, if such were the fact; they merely aver that they have no knowledge that any assignments of patents were executed or licenses granted in favor of the Chicago Company, and that the St. Louis Company did not own any patents on March 17, 1890; but it is not averred that it did not subsequently acquire the control of patents upon machines or processes for manufacturing brick, nor is it averred that the St. Louis Company failed to secure to the Chicago Company such exclusive right to use the patents, controlled by itself, as it had agreed to secure. In the absence of explicit allegations to this effect, which might have been made, it must be assumed that on March 17, 1890, or shortly thereafter, the St. Louis Company secured control of certain patents on machines or processes for manufacturing brick, and that whether such machines or processes were valuable or otherwise the Chicago Company secured the right to use them within certain prescribed territory, which right has never been challenged by any one. The averments of the bill tending to create the impression that the St. Louis Company never controlled any patents, and never secured to the Chicago Company the right to use them, are exceedingly vague, evasive, and uncertain, evidencing an intention to create an impression that such were the facts, without ascertaining what the facts were in this respect, and alleging them specifically. This method of pleading in a bill in equity—that is to say, a method whereby a part of the facts connected with a given transaction are alleged and other facts are withheld which, if unknown, might easily have been discovered and related on oath—is subject to just criticism, and warrants a chancellor in

presuming that whatever was left untold is unfavorable to the complainants' case.

The gravamen of the complaint is that more than 11 years before this action was instituted (the original bill having been exhibited on May 2, 1901) the Chicago Company, a Missouri corporation, engaged to issue one-half of its capital stock for the exclusive right to operate within certain territory under certain patents relating to the manufacture of brick, which patents, and the licenses given to operate thereunder, were of no value; that it did in fact issue one-half of its capital stock upon such a consideration although the law under which the corporation was organized (Rev. St. Mo. § 962) declared that stock in such corporations should "be issued only for money paid, labor done, or money or property actually received"; and that by reason of these facts the other stockholders of the company were greatly damaged. It is not averred, however, that the exclusive right to operate under the patents in question was known to the defendants or any of them to be of no value when the stock was issued, nor is it averred in the bill that the Chicago Company did not operate under the patents and did not exercise the exclusive rights which it had acquired. The bill shows very clearly that the Chicago Company has been making brick for the past 10 years, and has in the meantime paid dividends amounting to more than one-half of its entire capital, and for aught that is alleged in the bill the exclusive right to operate under the patents may have been esteemed of great value when the stock was issued in exchange therefor, and it may also be that the right in question has been exercised continuously by the Chicago Company from the time it was organized to the present date. If the facts are otherwise they might and should have been alleged specifically. The bill contains nothing that would warrant a contrary conclusion unless it be an allegation that when the Chicago Company purchased certain brick machines from the St. Louis Company and paid for them it thereby acquired the right to use them without any further license. It may be, however, that the sale of these brick machines was a part of the same transaction by which the stock was acquired, and that these machines would not have been sold to the Chicago Company but for the reason that it had engaged to purchase from the St. Louis Company the exclusive right to operate under certain patents for the manufacture of brick which the latter company controlled. In short, it may well be inferred, notwithstanding all the averments of the complaint, that the stock which was issued to the St. Louis Company was issued in exchange for rights that were supposed at the time to be of great value, and that these rights, such as they were, have been exercised continuously to the present time.

Let it be conceded, however, that the bill does show by proper averments that one-half of the stock of the Chicago Company was issued originally to the St. Louis Company in exchange for property that was of no value or of comparatively small value, and the question then arises whether complainants can be heard at this late day to complain of the transaction or are barred by laches. The wrong was committed more than 11 years before the bill was exhibited, and in the meantime it might have been discovered by the complainants or any other stock-

holder by the exercise of the slightest diligence. As stockholders, they were entitled at all times to have access to the books of the company, and even a casual examination of the corporate books would have disclosed the consideration that was received originally for the stock in question which, as it is now claimed, was issued illegally. The bill shows that when the complainants moved in the matter and investigated the company's books they had no difficulty in discovering what was received for the stock, and all the information that they now possess seems to have been derived from that source. No reason is perceived nor is any sufficient reason alleged why they did not discover the alleged wrong at an earlier period, since the bill utterly fails to disclose any acts on the part of the defendants or either of them which amount to an actual concealment of the wrong. The resolution to purchase certain exclusive rights from the St. Louis Company for the sum of $300,000 was spread upon the records of the company, where it of right belonged, and in view of that circumstance it is hardly conceivable how the complainants could have been ignorant of the manner in which the large sum of money agreed to be paid for such rights was in fact paid. At all events, if the complainants had at any time taken the trouble to inquire how this liability had been discharged or what amount of money or property had been received by the company in exchange for its capital stock, the whole transaction of which complaint is now made would have been discovered. The case is one, therefore, where the complainants' want of knowledge of the objectionable transaction was due to a lack of diligence in inquiring into matters in which they were deeply concerned; and even if it were true that an actual fraud was intended, and that the wrong complained of is something more than an ultra vires act, committed by the directors of the Chicago Company, still it does not appear that the wrongdoers concealed the transaction, for such facts as are alleged do not amount to concealment, and cannot be accepted as an excuse for a failure to discover the alleged violation of the statute, or the fraud, whichever it may be.

Under these circumstances, it is well settled by repeated decisions that complainants are barred of their right to relief. Courts of equity are not disposed to upset business transactions, or to disturb titles, that have passed unchallenged for years; and they will not do so unless at the instance of a suitor who has been diligent and persevering in the pursuit of his rights, and who can and does show good and sufficient reasons for not making an earlier application for relief. This doctrine is elementary, and has been frequently reiterated and applied, especially by the federal courts. Wood v. Carpenter, 101 U. S. 135, 139, 25 L. Ed. 807; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; Felix v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862, 36 L. Ed. 719; Wetzel v. Transfer Co., 12 C. C. A. 490, 493, 494, 65 Fed. 23; Kinne v. Webb, 4 C. C. A. 170, 54 Fed. 34; Naddo v. Bardon, 2 C. C. A. 335, 51 Fed. 493. In this case an attempt is made to charge the St. Louis Company as constructive trustee with a large sum of money which has been paid to it during the course of 11 years as dividends upon stock, which stock, as it is said, was unlawfully issued. If this be so, the state of Missouri, in the exercise of its visitorial pow-

ers over domestic corporations, may take steps to redress the wrong. Where an attempt is thus made to charge one as a constructive trustee of money or property, the rule, requiring a private suitor to be diligent and to plead and establish some adequate excuse for his silence and inaction during a period of years, is strictly enforced. Wetzel **v.** Transfer Co., supra. The usual limitation at law applicable to actions for relief on the ground of fraud is five years after the discovery of the fraud, and such is the law in Missouri. Rev. St. 1899 (Mo.) § 4273. The wrong or fraud complained of in the present instance should have been discovered, and would have been discovered by the complainants almost as soon as it was committed, if they had exercised even ordinary ·diligence. Indeed, it is difficult to understand why the alleged wrong was not discovered at that time. Acting in analogy with the rule prescribed for the governance of courts of law, it must now be held that in the forum of equity, where as much if not greater diligence must be exercised, these complainants were not entitled, on the showing made in their bill, to equitable relief, and it was properly dismissed by the lower court. Several other questions were discussed at length on the argument, but it seems unnecessary to notice them in view of the ruling that the complainants' right to relief is barred by laches.

The decree below is affirmed.