Gaston, J.
 

 In support of the exception taken at the trial to the admission in evidence of the inquisition of Lunacy, it has been insisted, in the first place, that the proceeding, wherein it was had, was so irregularly conducted, as to render such inquisition void. The alleged irregularities are, that the writ issued without a previous affidavit, and that it does not appear that the alleged Lunatic was present before the inquest, or was notified to attend the inquest, when taking the inquisition.
 

 Considering the inconvenience and distress, which may result from the issuing of a commission of Lunacy unnecessarily, it is a very proper caution to require, as preliminary thereto, an affidavit evidencing insanity and showing a fit ground for such a proceeding. It is manifest, however, that this is a matter of discretion, entirely under the control of the court, which has the general power, whenever it should think proper, to cause such writs to issue. It is true, that the Lunatic is entitled to be present before the jury; and if they deny him this right, such denial would be a sufficient cause for setting aside the inquisition. But it cannot be that these al
 
 *527
 
 leged irregularities will so entirely avoid the Inquisition, that ail persons may treat it as
 
 ipso facto
 
 null. The court jurisdiction to issue the writ, the jury had authority to make the inquiry, and their inquisition, returned and confirmed by the court, must be regarded with the respect due to such solemn proceedings, until it be reversed or superseded. It waS further insisted that the inquisition is vague, defective and repugnant — vague and defective because the jury do not, in diTect terms, “say that the said Susannah is
 
 non-compos”
 
 and repugnant in this, that the jury certify she is lunatic and idiotic. We do not feel the force of these objections. By the writ, the jury are to enquire upon their oaths, and return to the court the result of that enquiry, as to the insanity of the alleged lunatic. When upon their oaths, and under their seals, they
 
 certify
 
 that she is
 
 non
 
 compos,' unquestionably they so say, and when they declare that they so say because of the evidence before them, it is an expression of that which would have been implied, had they made no reference to the evidence. Whatever they say ought to be in pursuance of the conviction produced by the testimony. Nor do we admit that the inquisition is repugnant. It contains many unnecessary phrases and epithets used not in a technical, but in the ordinary sense. It states that she is lunatic and idiotic, not that she is a lunatic and an idiot. They further say that she is incapable of managing her affairs.
 
 All
 
 these may be rejected as superfluous and redundant, and then there remains the technical and precise finding that she is of an “insane mind.” This is enough to support the inquisition.
 

 The exception taken to the charge of the Judge, is in our opinion, unfounded. Whatever weight might be due to the criticism made upon a part of his Honor’s illustration of soundness of mind, viz. “that it is such as renders one capable of making a discreet and prudent disposition of his property,” if this part were detached from the context and regarded as laying down the criterion, by which to discriminate between legal sar.ity and insanity, we have no right, nor is it consistent with fairness, thus to consider it. The case states this as part only of an illustration and sets forth that his Honor did give the jury correct information of what in.
 
 *528
 
 in law constituted nnsoundness of mind, and specially instrueted them, that no weakness of intellect short of this legal unsonndness would avail to set aside the deed of Susannah Robinson to the defendant.
 

 A question is made for
 
 our
 
 consideration, which is of much general interest, and upon which the counsel on both sides have earnestly pressed for our decision. It is not presented in the regular mode, and in strictness we might excuse ourselves from noticing it. But we have considered it with much attention, and we will not decline from declaring the result to which that consideration has conducted ns. The case, so far as it makes this question, is as follows: “If the Supreme Court should refuse the defendant a new trial and should affirm the judgment of the court below, it is agreed by the parties that as to the slave Lewis, who died during the term and pending the trial, the matter should be considered as pleaded
 
 puis darrein
 
 continuance, or in such other form as would have rendered available to the defendant the fact of the death of said Lewis; and it is further agreed that the court, as to that part of the case, should render such judgment as ought to be rendered, were the point properly presented and the action had been brought for
 
 that
 
 slave alone. But this agreement is not to affect or in any manner interfere with the plaintiff’s verdict and judgment, so far as regards the other slaves sued for in this action.”
 

 Now it must be distinctly understood that no agreement of the parties can confer upon us a jurisdiction to render any other judgment than what in lawappears to us ought to have been rendered in the Superior Court. Be our opinion therefore what it may upon the question thus preseuted, the judgment of this court must be that the judgment of the court below be affhmed, because in that judgment we see no error. It will be for the parties, after the rendition of this judgment, to make their own arrangements for carrying into effect the spirit of their agreement.
 

 We hold it to be clear that the death or destruction of any specific thing, the subject of an action of detinue, occurring after the action brought, cannot avail to
 
 defeat
 
 the action
 
 *529
 
 of the plaintiff. Detinue isa mixed action, brought to recover specific goods or the value thereof, if they cannot be had, and also damages for the detention. The plaintiff may destroy his action by his own act, as by taking the goods after suit brought — because thereby he falsifies his own writ. So if the party after suit brought, were to release the specific goods to the defendant, he would by this his act release the entire action. “There is a diversity,” says Lord Coke, “between the act of a party and an act in law; for a man by his own act cannot alter the nature of his action, and therefore if lessee for life or years do waste, now is an action of waste given to the lessor wherein he shall recover
 
 two
 
 things— viz. the place wasted and treble damages. In this case, if the lessor release all actions real, he shall not have an action of waste in the personalty only; and if he release all actions personal, he shall not have an action of waste in the realty only. And so it is, if the lessee doth waste, and after surrendereth to the lessor his estate and the lessor accept thereof, the lessor shall not have an action of waste. But by act 'in law the nature of the action may be changed, as if a man make a lease
 
 pour terme d’auter vie,
 
 and the lessor doth waste and then
 
 cestuy que vie
 
 dieth, an action of waste shall lie for damages only because the other is determined by act inlaw.” Co. Lit. 285 a. The termination of the plaintiff’s interest in the goods, which in law necessarily follows when the goods cease to be, not having been caused by his own act, may change the nature of the plaintiff’s action, so far as it demands the restitution of the goods themselves, but it does not impair his claim for damages, because of the unlawful detention thereof. When an action is exclusively personal or exclusively real, and is for one entire thing, no plea can be good which does not altogether bar the action. But when the action is of a mixed nature, demanding a specific thing anddamages also, pleas may be good, which defeat the action in part only. Thus in an action of dower, the tenant cannot plead a prior term of years
 
 in bar
 
 to the action, but he may plead it in delay of execution, and to save himself from damages. (SeeRoscoe on real actions 223, and authorities there quoted.) So in a writ of dower
 
 unde nil habet,
 
 the
 
 *530
 
 plea of
 
 tout temps pret
 
 may be pleaded in bar of the damages, ^ecause heir, who is tenant, holds by title, and is guilty of no wrong until a demand be made; and upon such a plea the demandant is entitled to judgment of seizure of the land immediately, because as to that the action is undefended. Ditto 213. So in a
 
 quare impedit
 
 the patron may plead
 
 ne disturba pas,
 
 if in fact no disturbance took place; and upon this plea the plaintiff may either pray judgment and a writ to the Bishop, or may maintain the disturbance and proceed for his damages. Ditto 233.
 
 Colt
 
 v.
 
 Bishop of Cor.
 
 Hob. 162.
 
 Rex
 
 v.
 
 Bishop of Worchester,
 
 Vaughan 58. Upon a plea in
 
 Warrantia Chartoe
 
 the defendant may admit the obligation to warrant and plead im bar to the damages, that the plaintiff has not yet been impleaded, in which case the plaintiff is entitled immediately to judgment to recover his warranty, but not his damages. Fitz. N. B. 134 k.
 
 Roll
 
 v.
 
 Osborn
 
 Hob. 23. So if an
 
 ejectione firmpe
 
 be brought and the term runneth out pending the action, yet the action shall proceed for damages. Co. Lit. 285, a. In actions like these, the judgments, as to the specific thing demanded and the damages, are so far several, that the judgment for the one may be affirmed in a writ of error, and that for the other reversed. Har. note 4 to Co. Lit. 32, (b.)
 

 We see no sufficient reason why the death or destruction of thegoods demanded may not be pleaded to so much of the action as demands the goods, if in law such destruction is an answer to that claim.
 

 Upon principle, it seems to us that a destruction by the act of God is in Law an answer thereto." The action of Detinue affirms a continuing property in the plaintiff in the goods demanded, and alleges the wrong to consist in withholding from the plaintiff the possession thereof. When the goods cease to be, the property of the plaintiff therein ceases. He has no right to their possession; and upon this appearing the law would be absurd in awarding, that therefore the plaintiff do recover the said goods, or the said sum for the value thereof if they may not be had.
 

 The act of God does injury to no man. When a thing ceases to be, because of a dispensation of Providence, there
 
 *531
 
 may be loss, but there is no injury; and this loss falls upon the owner of the property. We know of no instance where the law interferes to throw the loss from him upon others, where it is not attributable to culpable act or neglect. Then it is not a mere loss, but an
 
 injury,
 
 and the wrong-doer is justly answerable for it.
 

 There is a marked distinction between the action of detinue and that of trover, though, in many cases, it is at the option of the plaintiff to bring which he will. The tormer asserts a continuing property in the plaintiff, and alleges the wrong to consist wholly in the withholding of the possession of his goods from him by his bailee; while the latter affirms that although they were once the proper goods of the plaintiff, they have been made the goods of the defendant) and complains of the injury caused by this conversion. If, after being thus converted, the goods perish by unavoidable accident, the loss falls upon the defendant, who has made them
 
 his;
 
 and this misfortune shall not exonerate him from answering for the prior wrongful conversion. If not converted, but, remaining in the hands of a bailee, they there perish, the loss is the misfortune of the owner, and the bailee is answerable for the wrong of detention.
 

 In ascertaining the value of the goods, in an action of detinue, the jury is to find the present value. This is manifest from the form of the writ of enquiry, which issues where there has been a judgment for the plaintiff on
 
 non sum informatus, nil (licit,
 
 or demurrer — from the form of the verdict, where the jury find the value on the trial of an issue, and from the terms of the final judgment. It is required, too, by obvious reasons of propriety. Great alterations of value may happen in the value of the things demanded, pending the action; and the object of the action (so far as regards the things themselves)is to regain them, such as they are, or, if that may not be done,
 
 then
 
 their value. If, in the course of a tedious action, a puny slave child has grown up to vigorous manhood, it would be a poor substitute for the slave himself to give the value of what he was, when the action was instituted. If, on the contrary, a vigorous, healthy slave has been rendered valueless by sickness and decrepi
 
 *532
 
 tude,it would be unconscientious to set upon him more than n01™na^ va-Iue- How ought the slave to be valued that is no more? If he were on the brink of the grave at the time the trial, the jury would discharge their duty by valuing him at.five cents; but if it is shewn that, before the trial, he had fallen into the grave, is he to be paid for as of full health and vigor? Is there not an absurdity in affixing any value to what is judicially ascertained not to exist?
 

 Certainly when a man detains, without just cause, the goods of another, he ought to be answerable to the full extent of the injury thereby inflicted. And so he is rendered through a judgment of damages for that wrong, if the wrong be one of detention merely. But if the injury is not only a
 
 wrong of detention, but
 
 of
 
 conversion,, let him then
 
 pay also the value of the property converted. Where the owner,
 
 by reason of such detention,
 
 has been deprived finally of the thing detained, as by voluntary destruction, or through culpable negligence of the bailee, it is not very material in what
 
 form
 
 the plaintiff gets his recompense; but he is not wholly compensated, unless he obtains both its use while detained and its value. But when such
 
 injury
 
 has not been inflicted, he is compensated by being paid for the wrong of which alone he can complain. It is not undeserving of consideration, also, that in many cases actions of detinue are brought to try some of the most difficult questions of title to slaves, and when both parties are equally conscientious in asserting a claim thereto. If, in all cases, the holder is not only to be liable, in the event of failure, for hire, while they are in his possession, but also to be insurer of their lives, we drive him to the often inhuman alternative of making the most of them by sale, instead of keeping them to abide the fair result of the contest. In this case, it would be manifestly unjust, because of a mere mistake of title, to make him responsible for an act of Providence, which no prudence could avert, and which would probably have occurred had the possession been with his adversary. It is enough that using the property humanely and prudently, he account for the use of it, while in his possession, and deliver it up, if it exist, when the controversy is decided against him. It would
 
 *533
 
 have been a great relief tons could we have found any thorities in point, to guide us in this enquiry. But it is extraordinary how little is to be found in the law books bearing directly upon this subject. The action of detinue, by reason that wager of law was permitted in it, has almost become obsolete in England — though very recently there are indications of a disposition to revive it.
 

 The following passage, which we extract from Roll’s Abridgment, Title Detinue E. pi. 33, 407, and is also to be found in Brook’s Abridgment Title Det. PI. 25, throws some, though faint, light upon it:
 
 “
 
 In detinue of charters, if the issue be upon the detinue and it be found that the defendant hath burned the charters, the judgment shall not be to recover the charters, for it appears that he cannot have them, but he shall recover the value of the land in
 
 damages.
 
 So also in Jenkins Cent. 288, Case. 22, who cites 22 Hen. 6, ch. 55, and saith, “ that the judgment in detinue in for the thing detained and damages for the detention; but if the thing cannot be had by reason of the defendant’s default, the inquest is to inquire and assess the damages, and the judgment is to be for the value and detention thereof.” It is admitted that these summary statements made from the year books, are meagre and unsatisfactory; and we have been disappointed in the efforts we have made to obtain access to the year books themselves. But, meagre as they are, they favor the opinion, that when such destruction has not proceeded from defendant’s fault, the defendant shall not answer for the value.
 

 In our State, there has been no adjudication upon the point to our knowledge, unless it be one of which there is a short note in Martin’s cases, page 74. The decision purports to have been made in Fayetteville. How the reporter (who certainly was not present thereat,) obtained his information of the case is not stated, and on
 
 what ground
 
 the judgmentitself rested, the report is entirely silent. It may have been because it was not stated in the case that the slave died by the aet of God, or because the court thought the matter could not be found on the plea of non-detinet. Little reliance can be placed on it as authority.
 

 In the State of Yirginia the question occurred, and was dis
 
 *534
 
 cussed in
 
 Austin’s Ex’rs
 
 v.
 
 Jones,
 
 Gilmer’s Virg. Reps. 341. The jury, in an action of detinue for several slaves, on the plea of non-detinet, found the issue as to all the slaves for the plaintiffs, and assessed their values severally, but they further found that Beck, one of the slaves so detained and so valued, had died pending the action. The court gave judgment for the other slaves, but rendered no judgment for Beck or her value. A writ of error was sued out by the plaintiff, and the cause removed to the Supreme Court, where it was argued before three Judges. On the main question, whether the plaintiffs ought to have had judgment for the value of Beck, Judge Coulter and Judge Brooks differed, the former holding the negative, and the latter the affirmative. Judge Roane concurred with Judge Brooks in reversing the judgment, but upon the narrow ground that the finding of the death of Beck was to be rejected as surplusage, because that fact had not been put in issue; distinctly declaring, that, his opinion did not extend to cases, in which the subsequent death of the negro was relied on by plea
 
 puis darreign continuance,
 
 or otherwise, so that the plaintiff had an opportunity to contest the point upon the evidence. We have seen references to decisions in Kentucky, apparently bearing-upon or connected with the question, but we have not been able to obtain correct reports of them. . ¡
 

 After much consideration, our opinion is,that the defendant may be permitted to plead in an action of detinue, as a plea since the last continuance, the death of a slave named in the declaration; and upon such plea being
 
 found true,
 
 there is to be no assessment of the value of said slave in the verdict, and the plaintiff shall have judgment for damages only because of the detention; that when such death has happened while the slave was in the defendant’s possession, and without his fault, the jury should be instructed not to include any part of the value of the slave in the estimate of damages; but if it has happened because of ill-treatment, or culpable neglect, or after a disposition of the slave by the defendant, that they be instructed that
 
 they may
 
 include the value in such estimate; and -it is further our opinion, that to prevent surprise, evidence ought not to be received of the alleged death,
 
 *535
 
 unless the matter be specially pleaded as aforesaid. The plea may be received, if properly verified, at any moment before the verdict is rendered. 1 Chitty’s Plea. 698.
 

 But notwithstanding opinion, which we entertain on this question, for the reasons heretofore mentioned, the judgment of the Superior Court must be affirmed with costs.
 

 Per Curiam, Judgment affirmed.