COCKRILL v. COCKRILL et al.

(Circuit Court, W. D. Missouri. March 1, 1897.)

1. CANCELLATION OF DEED—LACHES.
   Even though at the time of the execution of a deed the grantor may have been incompetent to transact business, and the deed may have been procured by fraud, yet as he allowed seven years to elapse after being restored to his right mind without making any complaint, and before instituting suit waited until the grantee was unable to speak in his defense, and much money had been expended in improving the property, and makes no offer to return the consideration, he is estopped from seeking to set aside the deed.

2. SAME—USURY.
   Where a father-in-law demanded as a condition of a loan to his spendthrift son-in-law that the latter should convey to his own wife a certain tract of land, a conveyance executed by the son-in-law in compliance with that condition does not constitute usury, and is not a badge of fraud.

3. DEED OF PERSON UNDER GUARDIANSHIP.
   The deed of a person under guardianship by reason of incapacity to manage his own affairs, in consequence of habitual drunkenness, is void.

4. INSANITY—HABITUAL DRUNKENNESS—REMOVAL OF GUARDIAN.

Under Rev. St. Mo. § 5549, which provides that "any person" may institute an inquiry as to whether one who has been declared to be of unsound mind has been restored, one who is under guardianship by reason of his being incapable of managing his own affairs on account of habitual drunkenness may, by his own petition, institute such an inquiry.

5. SAME—NOTICE.

Where one who is under guardianship as an insane person makes an application to a probate court of Missouri for restoration to his rights, notice to his family or guardian is not a prerequisite to jurisdiction, the want of it being at most an irregularity only, which cannot be taken advantage of in a collateral proceeding.

6. SAME.

One who has, upon his own application, been discharged by a probate court from guardianship as an insane person, cannot assail the judgment discharging him upon the ground that no notice of the application was given to his family or former guardian, even if such notice was required.

This was a suit in equity, brought by William F. Cockrill against defendants, Clinton Cockrill, Helen Woodson, and others, to set aside two deeds to land executed by the complainant, on the grounds of fraud, undue influence, and incompetency of the grantor to transact business.

Merryman & Merryman, for complainant.
Hall & Woodson and E. H. Norton, for defendants.

ADAMS, District Judge. This suit was instituted by complainant, William F. Cockrill, against defendants, Clinton Cockrill, Helen Woodson, and others, to set aside a deed to 251 acres of land sold by him to Clinton Cockrill on May 19, 1881, on the grounds of fraud, undue influence, and especially on account of the alleged incompetency of complainant at that time to transact his business, and for the further purpose of setting aside a deed made by complainant to Clinton Cockrill for the 160 acres known as the Fielding Cockrill homestead. This deed was made November 2, 1887. The same reasons are assigned for setting aside this deed as the former. The defendant Clinton Cockrill is the father-in-law of complainant, and the father of defendant Helen Woodson, who was formerly the wife of complainant. Two of the other defendants are complainant's minor children by his wife Helen. The other two defendants are children of Helen by her second husband, the defendant Byron Woodson. By deed dated May 19, 1881, the complainant, for the consideration of $6,000 paid to him, deeded a tract of 251 acres of land in Platte county, Mo., to his father-in-law, Clinton Cockrill. On the same day Clinton Cockrill and wife duly conveyed the same to Helen Cockrill and her bodily heirs, intending the same as an advancement to his daughter and her children. She then had two children by her husband, the complainant herein. The tract of land, according to the evidence before me, was not worth over $6,000 at the time, and this sum was paid to the complainant by his father-in-law for it. The complainant was then without doubt capable of attending to business, and no fraud or undue influence was practiced upon him in the transaction. I find no warrant in

the evidence for the contention of complainant's counsel that Clinton Cockrill undertook or agreed to pay complainant any sum above the consideration mentioned in the deed, $6,000; and therefore there is no ground for ordering an accounting in favor of the complainant for any unpaid purchase money. This disposes of the first ground of complaint alleged in the bill.

The second alleged ground of complaint relates to the homestead tract of 160 acres. The complainant inherited a fortune, in land, from his father, and indulged the reasonable expectation that his father-in-law would in a short time die, and leave another fortune for his own or his family's use and support. As is usual in such cases, he became inattentive to business, and convivial in his tastes and habits, and soon became addicted to the excessive use of alcoholic liquors. Under such circumstances, and with such habits, he became frequently short of money, and resorted to the common expedient of borrowing. Being still the owner of lands, inherited from his father, his credit was, to a limited extent, good. Prior to the year 1885 he had, from time to time, borrowed money from the bank of Wells & Co., of Platte City, till it amounted in April of that year to the sum of $2,739.02. He then applied for more, and could have secured it from the bank at 10 per cent. interest; but it was finally determined, in order to avoid paying the high rate of interest demanded by the bank, that the father-in-law should loan him $3,300 at 6 per cent. interest per annum. This was done, and with the money so borrowed he paid $2,739.02 to the bank, and had $560.98 for his own use. To secure the payment of this loan, the complainant executed a deed of trust bearing date April 29, 1885, whereby he conveyed to one C. C. Kemper, as trustee, a tract of 160 acres of land situate in Platte county, Mo., already referred to as the Fielding Cockrill homestead. As a part of this transaction, the complainant was required by Clinton Cockrill to make, and did make, a deed to another tract of 80 acres of land in Platte county to his wife, Helen. No consideration was paid by his wife to him for this grant, and only a nominal consideration of one dollar is mentioned in the conveyance. In passing it is proper to say that no relief is asked against this conveyance, but it is claimed that because the father-in-law persuaded the complainant to make this gift to his wife, at just this juncture, it amounts to exacting usurious interest for the loan of the $3,300, and therefore is to be considered in determining the issue of fraud in relation to the execution of the deed of trust itself. The complainant at this time had a family consisting of his wife and two children, aged, respectively, five and seven years. He so mistreated his wife that she was compelled to, and did some time after the month of April, 1887, take her children, and leave him. She instituted a suit for divorce, and on April 2, 1889, secured a decree. This decree also awarded to her the care and custody of the two children. While the complainant, even before April, 1885, had been addicted to the use of alcoholic beverages, and had frequently been under the influence of liquor, the evidence shows that he was fully capable of managing his own affairs, and at the time of executing the Kemper deed of trust under-

stood what he was about. No coercion or undue influence was practiced upon him by his father-in-law in this transaction unless it be in requiring him to make the gift of the 80-acre tract of land to his wife, which will be considered later. After 1885 the drinking habit seems to have increased. His sprees became more frequent, and were longer continued. He became abusive and cruel to his wife and family, and in June, 1887, due and proper proceedings were taken, at the instance of his relatives, in the probate court of Platte county, to have him adjudged non compos mentis, and on June 3, 1887, on inquisition had, he was duly adjudged by said court incapable of attending to his own business, and an habitual drunkard, and one William C. Wells was thereupon appointed guardian of his person and estate. Wells, the guardian, entered upon the discharge of his duty, and at once committed his ward to the St. Vincent's Inebriate Hospital at St. Louis for treatment. He remained there for nearly three months, and on September 1, 1887, was discharged by the medical staff of the hospital, consisting of Drs. Bauduy and Herman, as apparently cured. After his discharge, he endeavored to secure employment at Kansas City and other places, and succeeded in doing so for a space of a month or six weeks. Between September and November he occasionally appeared to be under the influence of liquor, but, after a careful reading of all the evidence relating to his conduct and mental condition up to November 1st, I am of the opinion that he did not, up to that time, resume his intemperate habits as of old, but that his maudlin condition, as occasionally observed, was rather the effect of some stupifying drug. Many witnesses testify to seeing him, and observing his conduct during this period, and pronounced him to have been intelligent, sensible, and entirely capable of transacting his own business. On the whole, I believe the evidence fairly warrants this conclusion. In this state of facts, the complainant, on November 1, 1887, after personal interviews with the probate judge of Platte county, prepared and filed a petition in said probate court in words and figures as follows:

"To the Probate Court of Platte County, Missouri: The petition of W. F. Cockrill shows to the probate court that on the 2d day of June, 1887, he was found by a jury and adjudged by said probate court to be incapable of managing his own affairs, and Wm. C. Wells was duly appointed guardian, and gave bond as required by law. Petitioner states that he has undergone treatment for his disability, and has been cured, and is now in condition to take charge of his own affairs. He therefore asks that proper, legal steps be taken to restore to him his rights, that inquiry be had into his present condition in the manner required by law, and that upon proper finding of a jury that his property be restored to him subject to his own control and management.
     "[Signed]                                        W. F. Cockrill."

—and duly sworn to. The evidence shows that the complainant wrote this petition himself, and presented it to the court for its action, and I am unable to find from a careful examination of the evidence that he was inspired or aided to do this by any of the defendants, or any persons acting for them. On the contrary, the evidence shows that this proceeding was entirely of his own motion; and, notwithstanding its suspiciously close proximity in time to the

transaction of the next day, I can find no satisfactory evidence of any connection with it by the defendants, and much less of any fraudulent connection. On the filing of this petition, on November 1, 1887, the court issued a venire for a jury to inquire into the mental condition of complainant, and thereupon a jury of 12 lawful men of Platte county came, and, after hearing the testimony, in the presence of complainant, returned the following verdict:

"We, the jury, find that the within-named, William F. Cockrill, is competent to attend to his own affairs.
"[Signed]                                    William Kimsey, Foreman."

And the court then and there made the following order:

"It is therefore considered by the court that said W  am F. Cockrill is a person of good mind, and competent to attend to his own affairs. Wherefore it is ordered that William C. Wells, guardian of the person and estate of said William F. Cockrill, do make final settlement of his accounts, and that he restore to the said William F. Cockrill all things remaining in his hands."

Prior to this time the complainant had made such default in the payment of the loan of $3,300 due to Clinton Cockrill as entitled him, Cockrill, to foreclose his deed of trust by a sale of the mortgaged property, and the requisite advertisement had already been commenced in one of the newspapers of Platte county. The complainant had no money to make payment of the loan, and on the advice and with the aid of his friends William C. Wells, his former guardian, E. O. Waller, one of the most respected citizens of Platte county, and others, who acted as intermediaries between him and Clinton Cockrill, who were now not on speaking terms, a settlement was concluded, by the terms of which complainant agreed to convey his interest in this home place of 160 acres (conveyed by the deed of trust) to Clinton Cockrill for $6,000. His title was subject to his wife's dower. Complainant made his deed to Clinton Cockrill and the grantee after taking out the $3,300 and interest due him from complainant, paid the balance of the $6,000 over to complainant, or to such persons as he directed; and subsequently, and prior to the institution of this suit, conveyed the land so acquired from complainant to his daughter, the former wife of the complainant, as a gift to or settlement upon her. The evidence shows no coercion, undue influence, or fraud of any kind exercised by Clinton Cockrill in this transaction, and further shows that the persons who advised the complainant in regard to it did it in good faith, believing at the time that they were rendering material, disinterested, and valuable aid to him. In my opinion, also, the transaction was in fact a reasonably fair one. Complainant's title was subject to the dower of his wife, and for that reason practicably not salable for even its value. Ordinarily, purchasers want a clear title, and usually, in their negotiations, exaggerate the importance of defects. The witnesses who testify as to the value of complainant's title and interest in the land in 1887 differ in their opinions somewhat, but no more than is usual in the expression of opinions in cases of this kind. From them all, taking into consideration the infirmity of complainant's title, I am satisfied that $6,000 was a fair and reasonable price for it at the time. At any rate, it cannot be claimed by

any fair-minded person that it was so unreasonably low a price as to be in itself a badge of fraud.

Complainant also contends that he was in fact so incapable of managing his own affairs at the time this last-mentioned deed was made that his act and deed was and is void. I do not think so. The evidence satisfies me that on November 1 and 2, 1887, to which dates much evidence is directed, the complainant was sober, understood well what he was about, and made the deed in question as his own voluntary act and deed. I quite agree with defendants' counsel in the following summary of the real facts of this case:

"The complainant's case is one of the common kind of a young man inheriting a fortune from his father, and wasting it in idleness and riotous living. The complainant was idle, and he was dissipated, but he was not an imbecile, and neither was he a lunatic. He had inherited one fortune, and he had, he fancied, married another; and this he thought made it unnecessary for him to labor, and so he did nothing but dissipate and fritter away the opportunities for a successful, useful, and happy life."

When urged by his wife not to neglect his business, but to go to work, his response to her was "that he wouldn't work; that when her old daddy died he would have more money than he could spend." As a result of such conception of his rights and duty, and of such a course of life as he led, he soon began, as already stated, to abuse and illtreat his wife, and she was compelled to resort to the courts to be legally separated from him. The conduct of Clinton Cockrill, in all the transactions complained of in this case, seems to me to have been inspired by a knowledge of the disposition and propensities of his son-in-law, and by a laudable desire to make the provisions for the maintenance and care of complainant's wife and family which the complainant neglected to make. Even if he had not paid complainant the full value of the land acquired from him (which I cannot find to be the case), yet, considering the fact that all the lands so acquired have been vested in complainant's wife and children for their support and maintenance, and thereby, in spite of himself, a part of his legal and moral obligation to his wife and family has been discharged, I could not, as a chancellor administering rights in conscience and equity, hold his own benefactor to a very exact accounting. Besides the foregoing facts, which are directly incident to the transaction in question, it appears to me that complainant is guilty of gross laches in instituting proceedings to set aside the deeds in question. He deferred action for nearly eight years after the execution of the last deed complained of, and has not offered to return the consideration received by him for his conveyances. During this time the main defendant, of whom he principally complains, has, through advancing years, decrepitude, and failure of health and strength, become unable to give testimony in the case. During this time, also, complainant's former wife—now by the generosity of her father, the owner of the property in controversy—has expended much money in improving the property, and the condition of things generally has been substantially changed.

In these observations concerning laches I do not overlook the proposition advanced by complainant's counsel, namely, that, as

complainant was insane, no offer to restore or put defendants in statu quo was necessary. But this contention involves a finding of fact to the effect that complainant was insane at the time the conveyances were made by him, and has continued so. I do not find either of these facts to be true. Notwithstanding the fact that complainant was again in January, 1888, declared non compos mentis, and a guardian appointed for him, it is apparent that this was a spasmodic condition, occasioned by the excessive use of intoxicating liquors at the time. He was sent to an inebriate asylum at Ft. Hamilton, N. Y., when, on an examination by the medical staff, on entering, he was found in general good health, suffering only from excessive use of whisky and the associate habit of using tobacco. He remained there three months, when he was "paroled," as it is called in the report. He then went to South Dakota with a surveying party under Prof. Bannister, and remained there, keeping the notes of the surveyor for several weeks, and returned to Platte county, where, upon like petition, order, and proceedings as before, he was, on the 6th day of September, 1888, adjudged to be capable of managing his own affairs, and the guardian, Overbeck, was discharged. Certainly, since this last-mentioned date—September 6, 1888—there is no evidence of inability on his part to attend to his business. In fact, there is comparatively little in the record concerning his habits or condition after this date, and certainly nothing to overcome the presumption of continued sanity after the finding and judgment on the inquisition held September 6, 1888. The complainant must, therefore, be held to all the consequences of want of action by him since that date, at least. Taking this date as a starting point, he allowed over seven years to elapse before even complaining of any ill treatment, much less instituting any suit for redress of his supposed wrongs. He waited until the supposed wrongdoer was unable to speak in his defense. He permitted his injured and innocent wife to expend money in improving the property which she supposed was her own. He retains the consideration received by him for the property, and makes no offer to return the same. His suit is against his own wife and children to take from them what her father, in times of her distress, occasioned by complainant's wrongful and cruel conduct, had given her. Whatever conclusion may be reached on questions hereinafter discussed, I am satisfied there is no equity in this bill; and, if there was, complainant is estopped by his own failure to do equity, and by his gross laches (Hammond v. Hopkins, 143 U. S. 224, 12 Sup. Ct. 418; Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873; Kinne v. Webb, 49 Fed. 515; Id., 4 C. C. A. 170, 54 Fed. 34–40), from asserting the same.

But complainant's counsel contend that his equitable rights are aided by certain strict rules of law, which I will now consider. And first, they claim that the deed of trust executed by the complainant to secure the loan of $3,300 made to him by Clinton Cockrill, of date April 27, 1885, is a usurious transaction. It is said that Clinton Cockrill demanded of complainant, not only a note bearing 6 per cent. interest per annum, but also demanded, as a condition of

making the loan, that complainant should simultaneously convey to his own wife the 80-acre tract of land already referred to, and it is contended that this conveyance was so made by the complainant at the time, without other consideration than securing the said loan of $3,300. It is true that such requirement was made and conformed to, but this does not constitute usury in the particular case under consideration. The lender demanded nothing for himself but a low rate of interest. He did demand that complainant, who was then a spendthrift, and who was the husband of his daughter and the father of her children, should, while he was yet able, make some provision for his wife and family. The complainant obviously recognized the justice of this demand, and for the first and only time, as shown by this record, voluntarily devoted a small part of his inheritance to the discharge of his natural, equitable, and legal obligations. To hold that such a settlement, even though instigated by the father, is a badge of fraud, would, in my opinion, be a strange perversion of equity. But this is not all, even if such conveyances could be held to constitute usury to the extent of the value of the 80-acre tract, yet, under the statute of the state of Missouri, it would not avoid the obligation created by the loan to pay the principal debt as made. The lender could recover the same, and enforce all his legal remedies to that end; and even the legal rate of interest could be recovered from the debtor for the benefit of the school fund. Ferguson v. Soden, 111 Mo. 208, 19 S. W. 727. For the foregoing reasons, I cannot hold, either as a result of equitable considerations or legal rules, that the rights of the parties to this suit are at all affected by complainant's conveyance of the 80-acre tract of land to his wife. The most serious and strenuous contention of complainant's counsel in this case is: That on November 2, 1887, when complainant executed the deed to Clinton Cockrill conveying the 160-acre home place, he was, as a matter of law, conclusively presumed to be incompetent to make the deed, for the reason, as alleged, that he was then, under the judgment of the probate court of Platte county, incompetent to manage his own affairs, by reason of his being an habitual drunkard.

At the outset of the discussion of this question, it must be admitted that the deed of an insane person while under guardianship is absolutely void; that the existence of guardianship over him is conclusive respecting the disability of the ward; and that this rule applies to a person under guardianship by reason of his being incapable of managing his own affairs in consequence of habitual drunkenness. Rannells v. Gerner, 80 Mo. 474. The question remains whether the complainant was in fact under guardianship on November 2, 1887, when he made the deed to the 160 acres in question. He had confessedly been duly adjudged incompetent by the probate court of Platte county on June 3, 1887, and a guardian of his person and estate duly appointed; and he had been, by the same court, on November 1, 1887, duly adjudged relieved of his disability, and competent to attend to his own affairs, and his guardian had been duly discharged, provided, the last-mentioned judgment is not void for one of two reasons, namely: (1) Because complainant him-

self was the sole petitioner in the proceedings resulting in such judgment, or (2) because no notice was given of the proposed inquisition to his relatives or guardian.

Section 5549, Rev. St. Mo. 1889, provides as follows:

"If any person shall allege in writing, verified by oath or affirmation that any person, declared to be of unsound mind, has been restored to his right mind, the court, by which the proceedings were had, shall cause the facts to be inquired into by a jury."

Section 5550 provides, in substance, that if it be found that such person has been restored, he shall be discharged from care and custody, etc. The language of section 5549 is certainly broad enough to permit any one to inaugurate the inquiry as to the continued insanity of a ward, and I know of no one more interested in the commencement of such proceedings than the person who believes himself to have been restored, and entitled to be discharged from bondage. To deny him this privilege might be the means by which evil-disposed persons could permanently restrain him of his liberty, and deprive him of his rights. A construction of the statute which will permit the ward to petition for his own discharge is in harmony with the practice pursued in the chancery courts of England, in exercising their jurisdiction over insane persons (Busw. Insan. § 69); and, in the absence of statutes to the contrary, generally prevails in the states of this Union (Id. § 70; In re Hanks, 3 Johns. Ch. 567; In re Christie, 5 Paige, 242).

In the case of McDonald v. Morton, 1 Mass. 543, the supreme court of Massachusetts, in dealing with this subject, says "the law contemplates that there may be a time when a person in the situation of appellant [under guardianship as an insane person] may be restored to his reason. I do not think he is to be left to his friends. Their ignorance of the fact, carelessness, or inattention ought not to leave him in bondage forever,"—and accordingly held that he might, by his own petition, institute an inquiry concerning his restoration. Inasmuch as the statute of Missouri, in sufficiently comprehensive language, confers this right upon any person, I am not disposed, in the light of reason or authority, to deny the right to the person above all others most interested in it.

The complainant further assails the validity of the judgment of the probate court of Platte county rendered on November 1, 1887, because no notice of the hearing of complainant's petition for restoration was given to complainant's family or guardian. In considering this question, it is well at the outset to note that the statutes of Missouri do not, in terms, require any notice in such cases; that the probate court of this state is a court of record, possessed of plenary jurisdiction to appoint, control, and discharge guardians of insane persons; and judgments within its jurisdictional limits are not subject to collateral attack for any mere irregularities. Bearing these facts and principles in mind, the question is: Does the above-mentioned want of notice of complainant's application for restoration to his rights so affect the jurisdiction of the court as to render its judgment thereon void? I think not, for the following reasons: The probate court had jurisdiction over the subject-

matter. This subject-matter was the status of the complainant himself. The finding and judgment of the court as to such status affected him and his relation to his property only. The proceeding is, therefore, analogous to a proceeding in rem, where jurisdiction is acquired over the res. It was probably in view of considerations like these that the legislature made no provision requiring notice of the hearing of an application for restoration to be given to any persons. The omission of such legislation becomes significant when it is considered that a certain notice is expressly required to be given of the hearing of a petition for the original appointment of a guardian, and this significance may be, as suggested by counsel for the defendants, that the application for restoration is not a new proceeding, but a step in the progress of a pending cause, namely, that which was instituted by filing the original petition for the appointment of a guardian. This view finds support in the following cases: Dutcher v. Hill, 29 Mo. 271; In re Marquis, 85 Mo. 617. Under such circumstances it is my opinion that notice to the former guardian or relative of complainant's application for restoration to his rights is not a prerequisite to jurisdiction. The want of it, at the worst, is an irregularity only, which cannot be taken advantage of in this collateral proceeding. Henry v. McKerlie, 78 Mo. 416; Rowden v. Brown, 91 Mo. 429, 4 S. W. 129; Dutcher v. Hill, supra; Kimball v. Fisk, 39 N. H. 110; Busw. Insan. § 56; Rogers v. Walker, 6 Pa. St. 371; Willis v. Willis' Adm'rs, 12 Pa. St. 159; Bethea v. McLennon, 1 Ired. 523. I have proceeded so far in the consideration of this last question as if the former guardian, or members of the family of the complainant, were themselves assailing the judgment of the probate court of November 1, 1887. But such is not the case. They are not complaining, or seeking to set aside the judgment for want of notice to them. The only person assailing the judgment is the complainant, who, by a petition drawn and presented by himself, invoked the jurisdiction of the probate court which rendered the judgment, and whose duty it was to give necessary notice in the case. His solicitude for the rights of others is very commendable as an abstract ethical question; but I know of no principle of law or equity which will permit the complainant to take advantage of his own wrong, even in the exercise of such praiseworthy solicitude.

From the foregoing it appears that there are no unyielding rules of law which demand an unconscionable solution of this case, and complainant's bill must therefore be dismissed.