### SODEN v. FIRST NAT. BANK OF KANSAS CITY et al.
### No. 4648.

District Court, W. D. Missouri, W. D.
April 9, 1948.

See also, D.C., 74 F.Supp. 498.

Anthony P. Nugent and Harry A. Hall, both of Kansas City, Mo., and Fred J. Federici, of Raton, N. M., for plaintiff.

Armwell L. Cooper and Ellison A. Neel, of Cooper, Neal, Sutherland & Rogers, all of Kansas City, Mo., for First Nat. Bank.

Paul R. Stinson and Dick H. Woods, of Stinson, Mag, Thomson, McEvers & Fizzell, all of Kansas City, Mo., for defendant Catherine M. Soden.

A. E. Margolin and F. Phillip Kirwan, both of Kansas City, Mo., and Fred C. Stringfellow, of Raton, N. M., for defendants Mary Ellen McGeorge, nee Soden, Rosemary Soden, Cathleen Louise Soden, and Patrick Soden.

REEVES, District Judge.

This is an action in equity to cancel and annul an instrument designated as a "Deed and Trust Indenture," dated February 28, 1931, but executed on March 18, 1931. By the terms of the instrument the defendant The First National Bank of Kansas City, a corporation, was made a trustee of an irrevocable trust. The beneficiaries of such trust were the plaintiff, his then wife, Catherine M. Soden, and his four children, namely, Mary Ellen McGeorge (nee Soden), Rosemary Soden, Cathleen Louise Soden and Patrick Soden.

The purpose of the trust, as expressed in the instrument, was,

"(b) to effectuate a family arrangement between the parties of the first part for the benefit of themselves and of their children, * * *."

The parties of the first part were Henry P. Soden (plaintiff) and Catherine M. Soden (his then-wife), one of the defendants. The so-called "Deed and Trust Indenture" was an elaborate and well prepared document, by the terms of which all of the property then owned by the plaintiff (very considerable in extent and yielding an income of approximately $50,000 annually) was transferred to the trustee, whose duty it became to collect the income from numerous properties fully described in the document and distribute the proceeds as follows: 46% to plaintiff, 30% to defendant Catherine M. Soden, and 6% each to the four children.

It is contended by the plaintiff that at the time and for a long period prior thereto and for many years following he was "physically and mentally incompetent and unable to carry on or to understand ordinary business transatcions or to handle his own affairs and property; and he suffered from alcoholic psychosis which rendered him of unsound mind, and his said impaired physical and mental condition continued to exist, and he remained physically and mentally incompetent and of unsound mind until on or about November 15, 1946, when he recovered from his mental and physical impairment."

It is asserted by the plaintiff that the condition of the plaintiff during all of said period was well known to each and all of the defendants. It is further asserted:

"That while the plaintiff was in said condition and on March 18, 1931, the defendants, Catherine M. Soden and the First National Bank of Kansas City, Missouri, knowing that he was physically and mentally unsound and unable to understand and manage his affairs and property, wrongfully, unlawfully and illegally procured plaintiff's signature to a Deed and Trust Indenture dated February 28, 1931, * * * which said Deed and Trust Indenture purports to convey to the defendant, the First National Bank of Kansas City, Missouri, as trustee, under an irrevocable trust, all of plaintiff's property of whatsoever nature and wherever situated without any provision for a reconveyance or return of plaintiff's property to him in the event of his physical and mental recovery; * * *."

Separately (the children in a group), the defendants have denied the averments of the complaint and have asserted the validity and regularity of the instrument and have interposed as well defenses of laches, estoppel, etc.

The evidence on the part of the plaintiff tended to show, (and this was undisputed) that from a period beginning shortly after his marriage in 1917 the plaintiff became and was greatly addicted to the intemperate use and personal consumption of strong drink, that he was not only frequently intoxicated, but much of the time continuously so, and that during the periods of such intoxication he was irrational and incompetent. In substance it was the evidence for the plaintiff that, for more than 20 years he indulged in a prolonged and an uninterrupted abandonment to dissipation and riotous living. This evidence was supplemented by experts who expressed the opinion that plaintiff's course of conduct and the physical symptoms produced thereby rendered him incompetent even during those intervals when he seemed to be in a measure free from the immediate influence of intoxicating beverages.

On the other hand, the evidence on behalf of the defendants tended to show that, at the time the questioned document was

executed, he was sober, in possession of all his faculties, mentally alert, and was then entirely familiar, not only with the contents of said document, but understood what he was doing when he executed it. Moreover, it was the evidence on behalf of the defendants that the conception of such a family arrangement originated with the plaintiff, who proposed it, and that he did so in recognition of his own weakness for liquor and his well developed dissolute habits, and that it was for the purpose of protecting himself against wasting his large estate as well as for the protection of his wife and children. He proposed an ir-. revocable trust so that his vast estate would be put beyond his reach and thus preserved for himself and family.

Following the execution of the instrument, while it was undisputed that the plaintiff was intoxicated many times, yet there was evidence of intervals when he was free from the influence of strong drink. During such intervals he was aware of the trust arrangements and that in September, 1931 his wife Catherine obtained a decree of divorce from him. Through his attorney he answered the complaint of Catherine and was advised that, because of the trust arrangement, no alimony was sought by Catherine or would be allowed in the decree granted to her.

After the decree of divorce (for his fault) the plaintiff remarried. He observed the usual requirements for obtaining a license as well as the formal ritual of marriage ceremony. Because of his conduct the second wife found it necessary to obtain a decree of divorce and the plaintiff made a substantial settlement upon her. His second wife sought a large award in the way of alimony but the amount claimed was much reduced by the representation made on his behalf that his property was tied up in a trust.

Plaintiff married again, and for a second time complied with the formulae of license and the ritual of the marriage ceremony.

One of the properties held in trust was a livestock ranch in New Mexico. Plaintiff acquired this ranch shortly after his first marriage in 1917, and lived on it rather irregularly until his third marriage, after which he returned to the ranch, and, with slight interruptions, has remained there. He has operated the ranch with the aid and faithful assistance of his third wife. He sold cattle, personally dealth with the purchasers; rode horseback about his ranch; drove his automobile; conveyed property; leased additional pasturable acreage for his livestock; made acknowledgments of conveyances before notaries public; acted and served as director on a hospital board; borrowed money at a local bank; applied for and was examined successfully for life insurance; and, in other ways, transacted business as if normal and unafflicted with the liquor habit. Those who dealt with him not only were advised but observed that on occasion he overindulged in intoxicating beverages and sometimes was known as a confirmed drunkard.

Upon these facts the following questions are presented: (1) Was the plaintiff competent at the time he executed the Deed and Trust Indenture challenged? (2) If incompetent at the time, did he have lucid intervals during a period so as to become familiar with his act in conveying his property in trust and thus debar himself because of laches from asserting the invalidity of the instrument? And (3) assuming incompetency at the time and a continuing disability, are the facts and circumstances in this case such as to invoke the interposition of a court of equity? These will be noticed.

1. Prior to March 18, 1931, the plaintiff was indulging in his intemperate habit and wasting his estate. Notwithstanding an income of approximately $50,000 annually he had become indebted to the defendant, The First National Bank, in the sum of approximately $70,000. He communicated this fact to his attorney and expressed the fear that, unless some action was immediately taken, he would encumber and waste his property. At his instance and insistence his attorney began the preparation of the Deed and Trust Indenture he now seeks to impeach. Many weeks, and even months, were employed in working out its terms. His then-wife was made acquainted with the effort. Being familiar with his habits, she understood and appreciated the necessity for some protective action that would conserve his income and protect his large

estate. According to the undisputed testimony, not only his attorney, but the trust officer of the defendant, The First National Bank, went over the details of the proposed trust many times with him. As a safeguard and a precaution and as an aid in the preparation of an acceptable and fair instrument plaintiff's attorney called to his assistance another reputable and well known attorney of recognized ability to advise and to consult with respect to the terms of the proposed instrument. On the day of its execution there were present, the plaintiff, his wife, Catherine M. Soden (now a defendant), the trust officer of The First National Bank, the two attorneys who had prepared the instrument. All testified, save the plaintiff, that the instrument was read and discussed in his presence, though plaintiff, who professed to know and appreciate the terms of the document, deemed it a waste of time to read its conditions again. Without exception these witnesses said that the plaintiff was sober and competent. The notary public who came to take the acknowledgment expressed the same opinion. This testimony was undisputed except by inference.

It is the duty of the chancellor, like all triers of a factual issue, to presume that each witness is telling the truth or endeavoring to do so. This occasion was so important and the instrument being executed so significant that it could not be readily inferred that the witnesses were mistaken or that they did not see things in their correct aspect. It was the official and professional duty of able counsel for the plaintiff and the capable and ethical lawyer selected to aid him to observe and even insist upon, not only the regularity of the procedure involved in the execution of so important a document, but, as well, to appraise the competency of all the parties to the agreement. Furthermore it was the duty of the trust officer, also a lawyer, to insist that the details in every particular should be regular, and, in like manner, to adjudge the competency of the parties. It was an irrevocable trust, conveying to the bank an estate yielding an income of approximately $50,000 per year. It was not an occasion for indifference or inattention but one that called for the utmost alertness on the part of each and every one participating in so important a transaction. The veracity of these witnesses is not debatable. This evidence should be accepted as conclusive.

2. Even if the plaintiff did not possess awareness at the time he joined in the conveyance on March 18, 1931, there were many transactions subsequently that should have fully acquainted him with the facts of the conveyance. There was distributed to him 46% of the net income annually. For a portion of the time much of this income was employed in liquidating the indebtedness of his wild and wasteful days and in making an adjustment with his second wife, and the remainder was used in the operation and management of his ranch in New Mexico. At different times he discussed intelligently the facts of the trust with sundry persons. In 1938 he applied for a policy of life insurance in the sum of $50,000 to protect his then and now excellent and estimable wife. He was examined by a medical examiner and officer of and from the head office of the insurance company. He was found to be physically and mentally fit. The policy was issued. He then related to the examiner, and this is undisputed, that his estate had been placed in trust. He told his second wife, before the marriage, that his estate had been put in trust. If he knew therefore, (and the inference is irresistible that he did) that he had executed such an instrument, received its benefits through the years, and neglected to take action at an earlier date, he would be clearly barred by the well known rule of laches and should not now be heard to assert his claim. The plaintiff, testifying on his own behalf, said that he had no knowledge either of the execution of the instrument or of any details or matters occurring thereafter, until November 15, 1946.

It is reasonable to infer upon the evidence that the plaintiff's memory serves him badly. His admitted intemperance over so long a period would doubtless blur and efface many impressions of his lucid intervals.

3. As indicated, the trust was created "to effectuate a family arrangement

between the parties of the first part for the benefit of themselves and of their children * * * ." It is not a case of dealing with a party at arms' length where advantage is taken of inability and incompetency. Catherine M. Soden was not enriched by this family arrangement. She was entitled to a standard of living and support consonant with plaintiff's large income. In addition to this, it was her right to the aid, the comfort and advice of the plaintiff, as her husband, and the father of her children, in maintaining their home and in rearing their four children. It was an obligation that he assumed at the marriage altar. His marriage contract was a civil contract. It was a solemn pledge to support and comfort his wife, for better or for worse, in illness and in health, until parted by death. By the trust arrangement he not only withdrew from his family 46% of an income that should have been used for the benefit of wife and children but he withdrew himself as a guide, mentor, adviser, and as an example to his children. The allotment that was made to Catherine was a mere pittance as a substitute for the tremendous obligation the plaintiff owed his wife.

So far as the children were concerned, it was a part of their birthright, not only to be supported according to the standards of living and the station in which plaintiff then stood, but to have the advice and the counsel of their father and to enjoy a background of sobriety and temperance on his part. These were taken away from them and they were accorded a very little as a substitute for his duty and obligations to them.

The plaintiff was not overreached in this commendable effort to preserve his estate against himself, and to dedicate a portion of it to the sustenance and support of his wife and children. In the case of Cockrill v. Cockrill, 8 Cir., 92 F. 811, tried in this division, the Court of Appeals of this Circuit said, in adopting the opinion of the trial judge, 92 F. loc. cit. 816:

"* * * considering the fact that all the lands so acquired have been vested in complainant's wife and children for their support and maintenance, and thereby, in spite of himself, a part of his legal and moral obligation to his wife and family has been discharged, I could not, as a chancellor administering rights in conscience and equity, hold his own benefactor to a very exact accounting."

Again, the court said, 92 F. loc. cit. 817:

"The complainant obviously recognized the justice of this demand, and for the first and only time, as shown by this record, voluntarily devoted a small part of his inheritance to the discharge of his natural, equitable, and legal obligations. To hold that such a settlement, even though instigated by the father, is a badge of fraud, would in my opinion, be a strange perversion of equity."

In Eaton's Adm'r v. Perry, 29 Mo. 96, loc. cit. 98, the Supreme Court of Missouri, in effect, commended, rather than condemned, a similar effort.

The plaintiff renounced and withdrew from his obligation to aid the defendant Catherine in the rearing and upbringing of their children. He placed upon her the heavy burden of being both father and mother to them. She accepted the responsibility and has well performed her duty. How well she did her duty was attested by the cultured daughters and the capable and manly son who were made defendants and appeared as witnesses in the case. Relying upon this trust she gave up and surrendered valuable marital rights. Now, when the evening has come and the shadows are lengthening and Catherine's work is almost done, the plaintiff would not only brand her as a perpetrator of a fraud upon him, but would take from her both home and sustenance, and, so far as this record shows, leave her penniless. Equity will not lend itself to such an untoward result.

As said in the case of Wolf v. Citizens Bank & Trust Company, 4 Cir., 92 F.2d 233 loc. cit. 236:

"A court of equity functions only to relieve a wrong, not to perpetuate one."

Upon the undisputed facts, the plaintiff does not come into court with a cause that appeals to the conscience of a chancellor. Plaintiff's complaint should be dismissed and a decree entered for the defendants.