Newport Hospital et al.
vs.
Charles S. Ritchie et als.
Eq. No. 2259.

May 15, 1931.

CHURCHILL, J. Heard on bill, answers, replications and proof.

The Newport Hospital, a corporation, on May 27th, 1929, leased to Otto

Voight a tract of land embracing about 47 acres, located in the Town of Middletown, lying east of Purgatory Point and bordering southerly on the ocean. The land is known as "Sachuest Beach" or "Second Beach."

The lease was made subject "to the rights of the inhabitants of the Town of Middletown * * * and of the State of Rhode Island," and contained the usual covenant for quiet enjoyment. After the execution of this lease Voight took possession. He erected barriers across various entrances to the land and charged an entrance fee to persons desirous of entering with automobiles.

Members of the Town Council of the Town of Middletown and the Chief of Police of the Town, and officers acting under him, attempted to throw down the barriers and interfered with lessee's control of the premises. Voight and the Newport Hospital thereupon brought their bill to enjoin the respondents from such interference.

The State of Rhode Island and the Town of Middletown were later made parties respondent.

By the pleadings the following questions are raised:

The title of the Newport Hospital to the land in question;

Whether, if the legal title is found to be in the hospital, grounds exist on which to decree a reconveyance to the Town of Middletown;

Whether the entire tract in question has been dedicated to the use of the general public;

Whether certain ways claimed to exist across the property from public highways to high water mark are public highways;

The rights of the public on the beach between high and low water mark.

### THE LOCUS IN QUO

The beach between high and low water is composed of hard sand, so firm that it affords an excellent ground for driving or parking automobiles. From the high water mark there is a belt of loose sand rising to a series of sand dunes; then a reverse slope falling from the dunes downward to a brook and marsh. The land is, and always has been, unenclosed, uncultivated and not used for any profitable purpose until the lease was executed, except the renting of space for a few bathhouses at the western end, and the sale of sand to persons other than those living in the Town of Middletown. The inhabitants of the Town of Middletown have used the beach for gathering and drying seaweed and taking sand and gravel. This use by the inhabitants of the Town has existed since Colonial times.

Purgatory Road, a highway from Newport, Paradise Road and Hanging Rocks Road form a junction near the westerly end of the tract. From Hanging Rocks Road a way runs back of the sand dunes to Sachuest Neck. Paradise Road was laid out in 1871-1872 and Hanging Rocks Road somewhat later.

### THE TITLE OF THE NEWPORT HOSPITAL

The land, of which the leased portion is a part, came to one Jonathan Easton in 1746 by deed from the Town of Middletown and then passed by mesne conveyance to the Hospital, which took by devise from John Alfred Hazard in 1880. The respondents make no attack on the mesne conveyances after the deed to Jonathan Easton, but do attack the conveyance to Easton.

The proprietors of the Town of Middletown on February 26, 1744, unanimously voted "to relinquish up to the Town of Middletown all the rights and interests in Sachuest Beach to be by the said town managed from time to time forever hereafter as an estate belonging to said Town."

May 8th, 1745, this conveyance was accepted by a vote of a Town Meeting of the Town of Middletown, and on April 16th, 1746, the Town of Middletown at a Town Meeting voted to sell

Sachuest Beach to Jonathan Easton for Two Hundred Pounds "in case he shall allow all such privileges as shall be thought necessary for the service of the town."

Acting under the authority thus given, the Town Clerk executed and delivered a deed conveying Sachuest Beach to Jonathan Easton.

May 19th, 1746, Jonathan Easton executed and delivered a bond to Thomas Gould, Treasurer of the Town of Middletown, in the penal sum of Two Thousand Pounds, upon this condition, among others, that the inhabitants of the Town of Middletown "shall have full and free liberty of going to and from the said beach or 'Commonage,' or any part thereof, without molestation, either on horseback or foot, likewise with carts and teams of oxen or horses to fetch and carry away from the said beach or 'Commonage' sand, seaweed, and shells, and all such drift stuff as any of the inhabitants aforesaid shall take up in the surf, or under high water mark against said 'Commonage' or beach, and that they shall have the liberty to lay seaweed and shells in heaps on any part of the said 'Commonage' and to carry off the same as it suits their convenience."

The Supreme Court in passing on the effect of this transaction between Jonathan Easton and the Town of Middletown, in the case of *Middletown* vs. *Newport Hospital*, 16, R. I. 319, held that a perpetual license had been given to the inhabitants of the town of Middletown to use the beach for the purposes specified in the bond.

The Newport Hospital does not contest the exercise of these rights by the inhabitants of the Town of Middletown, and the inhabitants were allowed free access to the beach by the lessee Voight.

The title of the Newport Hospital is challenged by the Town of Middletown and by the individual respondents, both as inhabitants of the Town of Middletown and as members of the general public, on the ground that by the action of a Town Meeting of Newport previous to 1746 the property in question was forever dedicated to the use of the public, and that without legislative authority (which concededly was never given) the Town of Middletown had no authority to convey the property to Jonathan Easton.

At a town meeting held on June 1, 1725, a resolution was adopted which purported to recite a vote of April 28, 1714, the pertinent portion of the resolution reading "an act of this Town bearing date April 28, 1714, wherein it is enacted that all vacant lands within the Town shall be and remain to all perpetuity for the use and benefit of the Town."

The land in controversy at that time was within the limits of the Town of Newport.

The respondents rely on the language used in the case of *Cascambas* vs. *City of Newport*, 45 R. I. 343, in support of their position that there was a dedication of the land to public uses forever by the vote of April 28, 1714.

The Court in that case said:

"In the record of a meeting of the freemen of the town held in 1704 it is recited that the proprietors in 1641 had agreed that after three hundred more acres were laid out the remainder should be a perpetual common. At a meeting of the freemen in 1714 it was voted that all vacant pieces of land in the town should be laid out as a perpetual common. We are of the opinion that in 1714 the freemen represented the original proprietors of Newport, that a meeting of the freemen could declare and put into effect the agreement of the proprietors made in 1641, and that thereafter all lands not laid out and allotted became common lands dedicated to public use."

The case involved a lease of Easton's Beach in the City of Newport.

The complainants urge that the language quoted from the opinion was

not necessary for the determination of that case.

It is unnecessary to go into a minute analysis of the Cascambas case since the decision is not a controlling authority on the power of the Town of Middletown to convey the land in question to Jonathan Easton.

By a course of contemporary acts and resolves of the Freemen of the Town of Newport it appears that either they did not regard Sachuest Beach as coming within the terms of the vote of 1714, or that they regarded as valid and within the intent of the resolution and as sufficiently securing the public rights a conveyance to private ownership with a reservation of rights in the beach to the inhabitants.

July 26, 1716, at a meeting of the Freemen of Newport, a committee was appointed to settle differences between "claimers of the meadows and lands lying * * * by Sachuest Beach and to see what beach remains undivided and belongs to the Town and land so finding undivided to let out or dis (pose) of for the Town's use."

This committee reported at a Town Meeting on October 3, 1916, and its report was approved as "an act of the Quarter Meeting."

Among other things the committee leased "Sachuest Beach" for seven years to Nicholas Easton with liberty reserved for the "freemen of said Town to (take) of what sand, seaweed, and shells they have occasion."

The proprietors, a distinct body from the freemen, regarded themselves as the owners of the beach. They became involved in controversies with Nicholas Easton, claiming from him the rent under the lease.

It is unnecessary to review the various aspects of this controversy. It came to an end after Middletown was set off from Newport in 1741. The proprietors in 1744 released all their right and title to the beach to the Town of Middletown, reciting in the vote that Sachuest Beach "be by the

said Town managed from time to time forever hereafter as an estate belonging to said Town."

Great weight is given to contemporaneous construction, particularly in relation to matters of as ancient a date as are involved in the case at bar.

This is the view taken by Chief Justice Durfee in passing on the right of the Town of Middletown to make the conveyance to Jonathan Easton under the reservation of rights contained in the vote of the proprietors in 1744 which is similar in its scope to the vote of the Town Meeting of Newport in 1714.

*Town of Middletown* vs. *Newport Hospital*, 16 R. I. 319.

Viewed from the aspect of contemporary opinion and construction, the right of the Town of Middletown to make the conveyance to Jonathan Easton in 1746, with the privileges reserved by the bond, must be taken as established.

The complainants also maintain that any question of title, legal or beneficial, is res adjudicata by force of the decree entered in the cause in equity, *Town of Middletown* vs. *Newport Hospital*, 16 R. I. 319.

In order to understand the genesis of the case, a brief reference to the case of *Newport Hospital* vs. *Carter*, 15 R. I. 285, must be made. The plaintiff in that case, Newport Hospital, brought a suit of trespass q. c. f. against the defendant for taking sand and gravel from Sachuest Beach. The defendant pleaded that he was an inhabitant of the Town of Middletown and that he had a perpetual license to go on the beach and take sand under the bond given by Jonathan Easton. This plea was held bad on demurrer. Thereupon, the Town of Middletown brought a bill in equity to reform the bond given by Jonathan Easton in 1746 to the then town treasurer of the Town of Middletown, and for general relief, the prayer of the bill being that the bond be reformed so that it run to the

Town of Middletown or to the inhabitants thereof. The Court refused to reform the bond, but it did take into consideration the entire transaction; the execution of the deed to Easton, the vote of the town meeting of the Town of Middletown, and the bond which was given in pursuance thereof, and held that a perpetual license had been thereby given to the inhabitants of the Town of Middletown to use the beach for the purposes specified in the bond.

The Court in passing on the attempt of the complainants to question the sufficiency of the execution of the deed to Jonathan Easton said: "For the purpose of this suit it must be assumed, since the complainant cannot consistently at the same time claim under the bond and repudiate the deed." The Court passed on the entire transaction and in so doing it was obliged to and did pass on the title in Jonathan Easton. It said: "The bond was an essential part of the transaction by which the beach passed to Jonathan Easton and entered into the very texture of his title." The Court confirmed the transaction in all its particulars, validating the deed and the bond.

The Court further held that the grant to the Town of Middletown came from the proprietors, and it examined the propriety of the conveyance to Jonathan Easton in the light of the grant of the proprietors, saying that the town ought to have kept the beach. The Court nevertheless held the transaction valid since the bond, conditioned as it was, carried out the intent of the town to reserve or preserve the rights of the inhabitants to use the beach.

The decree which raises the bar of estoppel was entered in the case in the September Term 1888. It provided, among other things, as follows: "that the bond described in the complainant's bill of complaint, executed by Jonathan Easton, and dated May 19th, A. D. 1746, is an essential part of the transaction by which the tract of land described in said bill of complaint as

Sachuest Beach passed to said Jonathan Easton, and that said bond entered into the very texture of his title."

In resisting the application of the doctrine of res adjudicata the respondents urge that the parties are not the same and that the case at bar is a case which differs from the case of *Town of Middletown* vs. *Newport Hospital*, 16 R. I. 319, and further that the Court in that case did not have before it the records showing the vote of the Freemen of the Town of Newport in 1714 purporting to dedicate certain land in Newport to the public use.

By reason of these facts the respondents urge that the case is taken out of the rule of res adjudicata.

The fact that the instant cause differs from the cause of *Town of Middletown* vs. *Newport Hospital*, and that the relief sought in the present bill and in the cross-bills differs from the relief sought in the prior cause, does not render the doctrine of res adjudicata inapplicable. If a former judgment is offered as evidence on a particular point, it is immaterial that the causes of action in the two suits are different if the same question has been previously determined in a prior proceeding either expressly or by necessary implication.

*Almy* vs. *Daniels*, 15 R. I. 312;

*Randall* vs. *Carpenter*, 25 R. I. 641.

For an excellent discussion where the same question was decided but a different character of action. see

*Masters* vs. *City of Raynier*, 238 Fed. 827.

In the instant case it was essential and necessary for the Court to pass on the validity and effect of both the deed to Easton and the bond from him in order for the decree to be entered. It did pass on both questions and the effect of the vote of the proprietors and the vote of the town meeting authorizing the conveyance, and it ruled expressly that the bond was part of the title, and in doing so it was obliged to hold that the deed was valid.

In pursuance of this opinion, a decree was handed down which provided that the bond in question was "an essential part of the transaction by which the tract of land described in said bill of complainant as 'Sachuest Beach' passed to said Jonathan Easton and that said bond entered into the very texture of his title."

The facts in regard to the ancient records of Newport and their availability are somewhat obscure on the record. That they were in existence in the city of Newport and in a condition where they could be examined and used in judicial proceedings is not in doubt. It is now too late to urge that there was matter of record available but difficult to reach and hence not used by counsel.

One of the points decided in the prior case was title—and title in the complainant, the Newport Hospital. In this proceeding the respondent, complainant in the prior case, contests the title established in the prior case and says a record has now become available which was in existence then but which counsel then did not use. This does not help the respondent to lift the bar of estoppel.

*Tucker* vs. *Carr*, 20 R. I. 477.

As between the Newport Hospital and the Town of Middletown the doctrine of res adjudicata requires a ruling that the title to the land in question has been conclusively determined to be in the Newport Hospital by reason of the decision and decree in the case of

*Town of Middletown* vs. *Newport Hospital*, 16 R. I. 319.

The individual respondents are contesting the title in their cross-bill. It is said that they, not being parties to the cause *Town of Middletown* vs. *Newport Hospital*, 16 R. I. 319, are not estopped to attack the title of the hospital.

The Middletown Town Meeting on April 24, 1877, voted that the town defend the rights of the inhabitants in and to Sachuest Beach in a suit that had been against an inhabitant. Various committees were appointed to act in the matter of the trespass suit or suits brought by the Newport Hospital for alleged trespass q. c. f. On October 8, 1877, the town appropriated $2000 for the defence of the rights of the inhabitants on Sachuest Beach, and finally a committee was appointed to protect "rights of the Town" in Sachuest Beach, employ counsel and to prosecute and defend suits at law or otherwise to protect the rights of the town in "Sachuest Beach and its adjoining commonage."

It was under this series of resolutions that the case of *Newport Hospital* vs. *Carter*, 15 R. I. 285, was defended for Carter, the defendant, and the cause in equity *Town of Middletown* vs. *Newport Hospital*, 16 R. I. 319, was brought and prosecuted and the decree obtained defining the rights of the respective parties.

The Town of Middletown represented in such prior cause in equity a class, the inhabitants of the town, who were then as much members of the general public as the individual respondents now are, in what was a controversy over the same property now claimed to be a public recreation ground. Both the inhabitants of the Town of Middletown and the general public are bound by the prior decree as far as the title is concerned. Those identified in interest in a former judgment are bound thereby.

*Hill* vs. *Bain*, 15 R. I. 75;
2 Black on Judgments, Sec. 548, p. 882;
*People* vs. *Halliday*, 93 Cal. 241;
*Healey* vs. *Deering*, 83 N. E. 226 (Ill.).

RECONVEYANCE TO THE TOWN OF MIDDLETOWN

The Town of Middletown and the individual respondents next urge that, if it should be found that the legal title to the land in question was vested in Jonathan Easton, nevertheless, a re-

conveyance should be ordered on the ground that the land was held by the Town of Middletown in trust for the benefit of the inhabitants and of the public generally; that by the conveyance of 1746 only the bare legal title passed to Jonathan Easton and that the trustee may now repent of its breach of trust and get in the legal title.

This theory of the case is based on the assumption that the effect of the vote of 1714 by the Freemen of the Town of Newport was to vest in the public forever the beneficial use of the beach for recreation purposes.

This aspect of the case has been dealt with in the ruling on the matter of title and the effect of the decision in the case of *Town of Middletown* vs. *Newport Hospital*, 16 R. I. 319.

Taking the case from either aspect, the Court is of the opinion, and so rules, that a valid conveyance was made to Jonathan Easton of the land involved and that such conveyance carried both a legal and beneficial interest to the grantee which now is vested in complainant, Newport Hospital, subject to the license to the inhabitants of the town to use the land.

In view of these considerations it is not necessary to pass on the other questions which arise under the prayer for reconveyance, but it may well be doubted if a Court of equity would exercise its powers to order a reconveyance where no tender has been made and where reconveyance is sought after a lapse of 184 years since the time of the original conveyance now claimed to be in breach of trust.

> *Lutjen* vs. *Lutjen*, 64 N. J. Eq. 773;
> *Naddo* vs. *Bardon*, 51 Fed. 493.

DEDICATION AS A RECREATION GROUND

The respondents claim that the entire tract of land included in the lease has been dedicated to the public use as a recreation ground by the Newport Hospital, or by its predecessors in title.

This dedication, say the respondents, is to be "presumed from long and uninterrupted user."

The interest which the public acquires by dedication is an easement, and the assent of the owner to the appropriation of his land to the public use and the creation of such an easement must clearly appear.

> *Hughes* vs. *Prov. & Worc. R. R. Co.*, 2 R. I. 493;
> *The Union Company* vs. *Peckham*, 16 R. I. 64;
> *Daniels* vs. *Almy*, 18 R. I. 244;
> *State of Rhode Island* vs. *Coy*, 44 R. I. 357.

No particular mode of creating an easement by dedication is prescribed by the common law.

> *State of Rhode Island* vs. *Coy*, 44 R. I. 357.

A clear and unequivocal act of dedication may be sufficient, as in *Hughes* vs. *Prov. & Worc. R. R. Co.*, 2 R. I. 493, or the case for dedication may rest on the assent of the owner, which may be inferred from his silence and acquiescence over a long period of time in the use of the land by the public when such public user is brought home to him.

> *Hughes* vs. *Prov. & Worc. R. R. Co.*, 2 R. I. 493.
> *Daniels* vs. *Almy*, 18 R. I. 244.

Whether or not a dedication to public use should be inferred from uninterrupted use by the public is a question of fact to be determined under all the circumstances of the case.

> *Daniels* vs. *Almy*, 18 R. I. 244.

In the case at bar there was no express or unequivocal act of dedication by the various owners after the conveyance of 1746, and hence the assent to the appropriation of the land to the general public use by way of dedication must be inferred. As put by the respondents, their case rests on the assent which it is claimed should be inferred from the acquiescence and silence of the owners during a long period

of time, and during which period there was continued use of the land by the public.

The land was unenclosed and running through it was a system of highways from which one could walk or drive directly onto that portion bordering on the ocean.

The beach had been used by the public for a long period of time for picnics, camping, parking of automobiles and for those recreation purposes for which the public would ordinarily use wild, unenclosed marsh and beach land.

The use of the beach by the public antedates 1860 and tradition carries it back to an even earlier period. The use of the beach has much increased in recent years due to the development of automobile traffic. The land has never been posted nor were any means taken by the different owners to prevent access to or the use of the land by the public until 1929, when the lessee stretched barriers across certain entrances and at the eastern end of the land posted signs forbidding entrance thereon.

In 1877 title to the land was asserted by John Alfred Hazard, predecessor in title to the Hospital, in an action of trespass mentioned in *Town of Middletown* vs. *Newport Hospital*, 16 R. I. 819, and after the Hospital took title, it also brought several actions of trespass before Middletown filed its bill in 1886.

The character of the land must be taken into consideration. It was wild, uncultivated beach land composed of sand dunes and marsh. It was not land fit for cultivation, and was unenclosed and, in fact, incapable of cultivation in the past or present state of agricultural art. Where this situation prevails, the inference of dedication to public use from acquiescence is obviously not so easily drawn as where the public has used uninterruptedly property of an improved character.

A well considered case on this point is *Ely* vs. *Parsons*, 10 Atl, 499 (Conn.)

wherein the Court, in denying that a way over unenclosed woodland could never be created by dedication, said:

"As a matter of evidence, however, it is unquestionably true and applicable here, as elsewhere, that the fact that the land over which a right of way by dedication is claimed is unenclosed woodland ought greatly to weaken and often to overcome the presumption of an intention to dedicate to be derived from its use. * * * We think it more logical and in better accord with the analogies of law * * * to treat it as a question of fact."

See also *Wray* vs. *Brown*, 155 Ky. 575;

*Montana Ore Purchasing Co.* vs. *Butte &c. Co.*, 25 Mont. 427;

*Clark* vs. *Paquette*, 66 Vt. 386.

In the instant case, the inference of assent by the owner necessary to turn the beach into a public park is greatly weakened by the fact that until very recently the use by the public did not interfere with the rights of the owner. The public came and went on the beach, used the property for picnics and for other forms of recreation without objection by the owners. There was no occasion until very recently for the owner to speak or interrupt the use, since such use did not material damage and did not diminish its use of the beach or the income which it derived from the sale of sand and the letting of space for bathing houses.

It is also necessary to consider the fact that the Hospital and its predecessors in title got the land burdened with a license under the bond of 1746, and the evidence is ample to show that the inhabitants of the Town of Middletown have availed themselves fully of their rights and privileges down to the present time.

The use of the land by the inhabitants is presumed to be under and in pursuance of the rights secured by the bond, and the owner, by allowing them to use it, can not be held to have dedicated the tract to the general public

for recreation purposes and for purposes much wider than the privileges given under the bond.

Tefft vs. Reynolds, 43 R. I. 539.

Taking all the facts of the case into consideration, among them the character of the land, the character of the use by the public, the fact that the use of the land by the inhabitants of the Town of Middletown for certain purposes was a use secured by the bond of 1746, and the fact that Hazard and the Hospital asserted their rights as owners in fee by their actions of trespass, the Court is of the opinion, and so finds and rules, that the land in question has not been dedicated to public use and that the public has acquired no rights by user.

People vs. Lake Forrest, 238 Ill. 305, 87 N. E. 320;

Littlefield vs. Hubbard, 128 Atl. 287 (Me.).

## WAYS

On the present layout a highway coming from Newport descends Purgatory Hill and at its base forms a junction with Paradise Road, which runs in a northerly direction, and with Hanging Rocks Road, which runs easterly. A cut-off runs between Paradise Road and Hanging Rocks Road which comes into Hanging Rocks Road just to the east of Sand Rock, a large rock located south of Hanging Rocks Road and on the land in question. Further to the east on Hanging Rocks Road a way leads off going back to the sand dunes through the marsh to Sachuest Neck.

These highway layouts run through the land of the Hospital.

It is the contention of the respondents that from these roads there are divers lateral ways running southerly to the high water mark, and that these ways are public highways, either by layout under legislative or municipal authority or have become highways by dedication or user.

The question of ways in this whole vicinity is one which involves nearly two centuries of dispute and litigation.

The respondents claim a public driftway was laid out by authority of the General Assembly in 1749-1750, which way now reaches high water.

By various acts the Assembly authorized the Town of Middletown to lay out a driftway from Easton's Beach to Sachuest Beach. Committees were appointed by the town to lay out the way. The report of one committee was rejected, one was approved. It is claimed by the respondents that the way finally laid out ran from Purgatory Hill to the south of Sand Rock, thence easterly joining a way leading from the north and turning easterly to a landing place on the Seaconnet River. At that time high water mark was below Sand Rock. At the present, such a way, if it exists, would go to high water mark at or near Sand Rock owing to the change in the coast line.

The town became involved in litigation in respect to the way with Jonathan Easton who obtained a judgment against the town and appealed to the General Assembly in respect to the layout. No action was taken by that body, the two Houses not concurring in action on his petition.

There is no evidence that a way was ever constructed or used under the authority of the Acts referred to, and while it is true that a highway legally laid out by proper authority remains a highway in absence of proof of abandonment, yet the fact that no way was physically laid down or used may be taken into consideration in passing on the question involved here, namely: whether legally a way ever came into existence, and, particularly, where the non-user is over such a length of time. Moreover, in 1872, when Paradise Road was built, the old way from the north, which the projected way of 1750 was to join, was abandoned and the cut-off running south from Paradise Road to Hanging Rocks Road was substituted therefor under an agreement between the Town and the owner of the fee.

In 1883 a petition was presented to the Town Council of Middletown which set forth that "no highway existed leading to high water mark from the west corner of Sachuest Beach" (the exact location of the alleged driftway) and prayed that a highway be laid out. This petition was granted and a committee was appointed to lay out a highway sixty feet wide "from the highway at the foot of Purgatory Hill at the westerly end of Sachuest Beach * * * down to high water mark on said beach."

No action was ever taken and no road laid out, but the declaration of the respondent town is one of the important facts to be taken into consideration on the question of highways or public driftways leading to the high water mark in existence in 1883 at the west end of the beach.

Taking all these factors into consideration I find that no highway or public driftway was in existence over the land in question extending to high water mark in 1929, at the time of the lease to Voight, as a result of legislation by the General Assembly in 1749-1750, or at any other time.

There is substantial evidence in the record that one public way has been created since 1883 by dedication.

At a point near Purgatory Hill and at the extreme western end of the beach there is a clearly marked way of sufficient width to accommodate the passage of carts, carriages and automobiles. This way is cut through a bank on the land of the Hospital and extends over such land from the highway on the north to high water mark. This way has been in existence for about forty years. The way was cut through the bank in 1888 or 1890 by certain inhabitants of the Town of Middletown who desired a way onto the beach to get sand and gravel.

While no way came into existence by such act by dedication, yet, since the way was made, the use by the general public, as distinguished from the

use by the inhabitants of the Town of Middletown as licensees under the bond of 1746, has been extensive and has increased year by year up to 1929 when the lessee Voight erected his barriers. There has been an increase in public use since the advent of the automobile, at least in the last twenty years.

The way was a convenient one by which to reach the strip of beach between high and low water. It was also used by commercial vehicles going to Sachuest Neck or Sachuest Point over the beach at low water.

There is substantial evidence that repairs were made by the Town of Middletown to the way through the bank on various occasions from the time it was cut through.

No attempt was ever made by the Hospital to prevent the use of the way by the general public nor any protest or action taken on account of the cut made in the bank. Knowledge that the way was being used by the general public was widespread in Middletown and Newport. The beach in the vicinity of the way was not an abandoned property. The Hospital leased sites for bath houses since 1912 and had for years, at least as early as 1888 or 1890, collected revenue from the sale of sand and gravel to others than the inhabitants of the Town of Middletown. On all the facts, the Court finds knowledge of use by the public for at least twenty years prior to 1929 brought home to the Hospital.

While it is true that the use of an easement is presumed to be in accordance with the grant, yet in the case at bar the public use was so long, manifest and increasing, both for pleasure and commercially, and was so distinct from the use by the inhabitants of the Town of Middletown under the bond of 1746 that the presumption that the way was being used by licensees under the bond must yield to the actual and notorious facts of public user. The Hospital in view of all the facts relative to such use by the general public

was not entitled to presume that the use was solely by the licensees.

Taking into consideration the marked physical change made by the cut through the banks; the well-defined way through the cut to high water mark; the public use for forty years: the increasing amount of public travel over the way; the repairs made by the Town; the knowledge of the Hospital of the public use and its acquiescence in such use from the time it began in 1889-1890 until 1929, the Court is of the opinion and so finds and rules that at the time the lease to Voight was executed a public way by dedication existed leading from the highway over the land of the Hospital to high water mark, such way being the westernmost way adjacent to Purgatory Hill.

> *Hughes* vs. *Providence & Worcester Railroad*, 2 R. I. 493;
>
> *Daniels* vs. *Almy*, 18 R. I. 244;
>
> *Folkstone Corporation* vs. *Brackman*, 1914 A. C. 338.

The point is made that the way in fact is not on land of the Hospital but is on land belonging to St. George's School. The owner of such adjoining land is not a party to this bill and hence no finding on this point is made.

The next way claimed is in a different category under the evidence.

The testimony as to the use by the public is much the same, as is also the length of time during which such use has been exercised. The physical aspect of the way is different. There was no cut through a bank. In regard to repairs by the town the evidence is scanty; in fact, only on one or two occasions is there evidence of repairs. They were made after a high sea had damaged Hanging Rocks Road. Repairs were then made to the road and incidentally some filling in was done on a portion of the way near this road.

Taking all the facts into consideration, the evidence is not sufficient to find that there is a public highway by dedication or user to the high water mark at this point.

From about this vicinity to Sand Rock there is a wide space sloping down to the high water mark from Hanging Rocks Road and over it vehicles may be driven at the right stages of the tide. Over this open space there is no sufficient evidence of a public highway existing either by dedication or use. Persons left the highway and rode or walked over this open space to the water, but no definite way of the character necessary to establish a public highway by dedication or use was ever created and no repairs of any character were ever made at this location.

On all the evidence I find that no public way exists in this vicinity to high water over the land of the Hospital.

A way is claimed by the respondents just to the east of Sand Rock and which they assert runs to high water mark.

As nearly as 1716 a committee appointed by a meeting of the Freemen of Newport to settle the difference between persons claiming land in the vicinity of Sachuest Beach and to inspect into "the highways leading to and over said beach and to lay open all such highways that are shut up."

This committee among other things laid out a "highway from ye falls at ye west end of said Beach all along said Beach to a creek * * * which * * * is established for a highway to the landing place on the north side of said Beach."

The Mumford Plat which was made a part of the report shows a way coming from the north and running to the northern boundary of the Beach and then turning and running easterly along the extreme northern line of the Beach and then northeasterly to a landing place on the Seaconnet River. At no place did this right of way cross the Beach and reach the high water mark.

In the bond given by Jonathan Easton in 1746 in which was contained the recital of the privileges of the inhabitants of Middletown is found a

reservation of a right of way through Easton's land which lay to the north of the Beach. A driftway was reserved which ran across this land "Down to the Commonage sold to him," and way "over the Commonage sold to him to the eastmost part thereof until it comes to Anna Bennett's Lot and from thence to the landing place." An inspection of the Mumford plat shows that no part of this driftway went beyond the extreme northern portion of the Beach. This north and south driftway opened onto the Beach at points which, if prolonged, would have come to the east of Sand Rock. There is no testimony that the way was ever at any time extended across the Beach to high water mark either by actual construction, use, or by an official layout.

Paradise Avenue was laid out in 1871-1872, and later in 1872 rights of the Town in and to, the driftway running south from the Falls were released to the adjacent owner, John A. Hazard, and in substitution thereof a new way was laid out. This was the cut-off running in a southerly direction from Paradise Avenue. It continued south beyond what is now Hanging Rocks Road and to the east of Sand Rock and terminated, according to the plat filed with the report of the Commissioners, about 150 feet north from high water mark.

That portion of the cut-off lying south of the location of Hanging Rocks Road was never improved or repaired by the Town until after the controversy arose between the Town officials and the lessee in 1929.

The evidence fails to show a certain, marked out way beyond Hanging Rocks Road running south and east of Sand Rock. As one witness characterized it, "You went anywhere you wanted to through the soft sand" when proceeding across the Beach in that locality.

Just before the decree for a temporary injunction was entered in this cause the town began to lay a road south of Hanging Rocks Road and east

of Sand Rock. The portion so laid out physically did not follow the layout as shown by the recorded plat filed with the report but ran to the high water mark.

The Court finds that the only highway east of Sand Rock and south of Hanging Rocks Road is that shown by the report of the Commissioners and by complainants' "Exhibit Y," and this does not reach high water mark.

From Hanging Rocks Road and from the way leading from that highway to Sachuest Neck there are a number of ways and paths leading in a southerly direction on the land of the Hospital. Some of these ways are used by the inhabitants of the Town of Middletown to get onto the Beach to the south of the line of sand dunes and some are used by the general public. None go to high water mark. A few of the ways are passable across the dunes by teams but not by automobiles and some are passable by light cars. None of them have any aspect of permanency. The town has never repaired any of them and in view of their character, the character of the land through which they pass, and the character of the use made of them, they can not be deemed public ways either by dedication or user.

*State* vs. *Nudd*, 23 N. H. 327.

Much testimony was introduced attempting to show that a public way exists from the west end of the Beach to the east end over the Beach between high and low water or above high water between the same points.

At low tide vehicles often enter at the west end of the Beach and go off at a point beyond the line of the Hospital land, traversing the strip between high and low water mark. At high tide the Beach is scarcely passable for vehicles of any character over the space between the dunes to high water mark. A way exists to the north of the dunes, running to Sachuest Neck and Sachuest Point from Hanging Rocks Road, which has been in use for a long period

of time. There is no apparent, physically delineated way along the Beach from west to east and between high and low water, or above the high water mark (apart from the way north of the dunes), and whatever traces of passage are left by vehicles below high water mark are obliterated by the next high tide.

No authorities have been submitted in support of the position that a public highway has been created under these circumstances on land belonging to the State or on the land of the Hospital, and I therefore find that no such east and west public ways exist. This ruling does not include the way north of the dunes, above referred to, running from Hanging Rocks Road to Sachuest Neck and Sachuest Point.

The matter of the ways has been considered in relation to the rights of the general public therein.

In the bond given by Easton in 1746 the inhabitants of the Town of Middletown were given full and free liberty of going to and from the said "beach or Commonage or any part thereof."

The points at which such inhabitants may enter the Beach in the exercise of the license has not been argued before me and the matter is reserved for a further hearing before the entry of final decree.

### Use of the Foreshore

In recent years the foreshore bounding the property leased to Voight has been extensively used as a parking ground for automobiles. They were driven onto the beach in great numbers below high water mark when the stage of the tide permitted and were parked there for hours, the occupants using them as bath-houses and for picnicking purposes. Witnesses described the beach below high water mark as black with automobiles so parked, or as parked in a continuous line along the beach in front of the land of the Hospital. It is a situation common on all beaches to which the public has access and raises in an acute form the ques-

tion of the relative rights of the State, the public and the littoral owner.

In his answer, the Attorney General of Rhode Island asserts the public has the rights of passage over the foreshore and of navigation and fishery, and also claims the right of the public to use the foreshore for "other purposes * * * but just what they are he is unable at the present time to state." He prays in his crossbill that the complainant Voight be restrained from interfering with the exercise by the public of the rights claimed on their behalf in the cross-bill.

That the State has the fee in the land between mean high and low tide and that the public has the rights of navigation and fishery on or over such shore is not disputed by any of the parties. The question is whether or not the public has a right of passage over such foreshore in addition to the rights of fishing and navigation.

The complainants contend for strict application of the English common law as laid down in *Blundell* vs. *Catteral*, 5 Barn. & Ald. 268 (1821), followed and affirmed in *Llanderno* vs. *Woods*, L. R. 1889, 2 Ch. 705; and *Lord Fitshardinge* vs. *Purcell*, L. R. (1908) 2 Ch. 139.

These cases establish the doctrine that the rights of the public to the use of the foreshore are restricted to navigation and fishery.

It is true that in these cases the Crown had granted the foreshore to private owners but the English cases cited do not turn on this point but rather on the extent of the rights of the public regardless of the character of the ownership of the foreshore.

Whether the common law rules will be followed strictly depends upon the extent to which they are reasonable and in accord with our public policy and sentiment, and whether they are adapted to the different conditions prevailing in this country.

Town of *Brookhaven* vs. *Smith*, 188 N. Y. 74; (a case involving the

right of a riparian owner to wharf out).

That the public has a right of passage over the foreshore is not established by any decision squarely in point. In two cases, nevertheless, the Supreme Court has included the right of passage in addition to the rights of navigation and fishery in defining the rights of the public on tide flowed land.

*Allen* vs. *Allen*, 19 R. I. 115.

*Rhode Island Motor Co.* vs. *City of Providence*, 55 Atl. 696.

New York follows the same doctrine.

"Every one can, however, * * * go upon the seashore between high and low water marks to fish, to bathe and for any other lawful purpose."

*Murphy* vs. *City of Brooklyn*, 98 N. Y. 642.

*Johnson* vs. *May*, 189 App. Div. 196.

The Court is of the opinion and so rules that the public has the right of passage over the foreshore on foot or in vehicles in addition to the rights of navigation and fishery.

While the public has such right of passage, no right is conferred on the public to interfere with the right of access to the water over the foreshore which is vested in the owner of the upland. The right of access is a vested property right in the nature of an easement and in case of conflict between the right of the public to passage and the right of access of the littoral owner, the right of the public is subordinate.

*Allen* vs. *Allen*, 19 R. I. 114;

*Rhode Island Motor Co.* vs. *City of Providence*, 55 Atl. 696;

*Kirwin* vs. *Mexican Petroleum Co.*, 267 Fed. 460 (opinion by Brown J.)

*Barnes* vs. *Midland R. R. Terminal Co.*, 193 N. Y. 378.

The littoral owner may in the proper case enforce his rights of access although the fee is vested in the state.

*Rhode Island Motor Co.* vs. *City of Providence*, 55 Atl. 696.

*Kerwin* vs. *Mexican Petroleum Co.*, 267 Fed. 460.

The evidence shows that automobiles are parked in such numbers and for such a length of time along the shore in front of the property of the Newport Hospital, and now leased to Voight, as to constitute a material obstruction to the right of access vested in the owner and now in Voight, the lessee.

Under the circumstances clearly shown in the proof, the Court is of the opinion and rules that the right of passage which the public has does not entitle members of the public to park automobiles or other vehicles in front of the land of the Newport Hospital for the purpose of bathing, or for any other purpose except to meet a temporary exigency.

The right of the inhabitants of Middletown to take gravel, sand and seaweed, and to stop for that purpose, and to use the beach under the terms of the bond of 1746, is excepted from this ruling.

The Court will hear the parties before the entry of final decree in respect to the remedy open to the complainants to preserve their rights of access.

For complainant: Sheffield & Harvey.

For respondent: John C. Burke, William W. Moss.